SIERRA CLUB, Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY, et al., Respondents.

No. 96–1007.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 29, 1997.

Decided Nov. 4, 1997.

Howard I. Fox, Washington, DC, argued the cause for petitioner, with whom Robert E. Yuhnke was on the briefs. William S. Curtiss entered an appearance.

Eileen T. McDonough, Attorney, U.S. Department of Justice, Washington, DC, argued the cause for respondents, with whom Lois J. Schiffer, Assistant Attorney General, Sara Schneeberg, Attorney, Environmental Protection Agency, and Peter J. Plocki, Attorney, U.S. Department of Transportation, were on the brief.

Before: EDWARDS, Chief Judge,
GINSBURG and TATEL, Circuit Judges.

Opinion for the Court filed by Chief Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Chief Judge:

Section 176(c) of the Clean Air Act, as amended in 1990, provides that, before any transportation project, program, or plan ("transportation activities") located in air quality regions designated as "nonattainment areas" or "maintenance areas" can receive federal approval or funding, the transportation activity must be found to conform with the applicable State Implementation Plan ("SIP") or, if a SIP is not yet available for the region in question, with interim requirements. 42 U.S.C. § 7506(c) (1994 & Supp.

1995). Appellant Sierra Club challenges a regulation promulgated by the Administrator of the Environmental Protection Agency ("EPA") providing for a twelve-month grace period during which transportation activities in designated nonattainment areas would be exempt from the transportation conformity requirements. *See* 60 Fed.Reg. 57,179 (1995); *see also* 40 C.F.R. § 51.394(d) (1996).

We hold that the challenged grace period is contrary to the plain meaning of the Clean Air Act. The Clean Air Act categorically mandates that the transportation conformity requirements shall apply to nonattainment and maintenance areas. 42 U.S.C. § 7506(c)(5) (Supp.1995). The Act does not provide for any grace periods or other exemptions from the conformity requirements for areas designated as nonattainment areas, nor does it authorize the EPA to create such exemptions. Thus, the grace period unlawfully narrows the Act's strict and broad ban against nonconforming transportation activities.

## I. BACKGROUND

The Clean Air Act establishes a joint state and federal program to control the nation's air pollution. Section 109 of the Act requires the EPA to establish National Ambient Air Quality Standards ("NAAQS") for certain pollutants. 42 U.S.C. § 7409 (1994). Section 110 contemplates that the measures necessary to attain the NAAQS will be applied to individual sources of pollutants through SIPs, prepared by each state and subject to EPA review and approval, for each "air quality control region" within the state. § 7410. A SIP must specify emission limitations and other measures necessary to attain and maintain the NAAQS for each pollutant. § 7410(a)(2)(A)-(K).

Section 107(d)(1)(A) of the Act requires the Governor of each state to designate each air quality control region in the state as either: (1) nonattainment—the area does not meet the NAAQS or it contributes to ambient air quality in a nearby area that does not meet the NAAQS; (2) attainment—the area meets the NAAQS and does not contribute to NAAQS violations in nearby areas; or (3) unclassifiable—there is not sufficient information available for classification. § 7407(d)(1)(A). The EPA must establish the earliest practicable attainment date for each nonattainment area, § 7502(a)(2), as well as a schedule by which the state must submit a SIP revision that complies with the requirements for nonattainment areas in order to attain the NAAQS ("control strategy"). § 7502(b), (c). Section 107(d)(3) establishes a process for redesignation to reflect changes in air quality over time. § 7407(d)(3). Redesignation requires notice in the Federal Register announcing the pending redesignation. § 7407(d)(2)(A). If a nonattainment area is found to have attained the NAAQS, it is redesignated as a "maintenance" area and must comply with a control strategy designed to maintain compliance with the NAAQS. § 7505a.

In the 1970 Act, Congress required SIPs to include "transportation control plans" as part of their strategy for achieving or maintaining attainment. Pub.L. No. 91–604 § 4(a), 84 Stat. 1680 (1970). In 1977, Congress prescribed more stringent transportation conformity requirements, including section 176(c), which provides that federal agencies may not "engage in," "support in any way or provide financial assistance for," "license or permit," or "approve" any transportation activity that does not "conform to" applicable SIPs. Pub.L. No. 95–95, tit. I § 129(b), 91 Stat. 749, 750 (1977). Congress further strengthened the Act's transportation conformity requirements in 1990. Pub.L. No. 101–549, tit. I § 101(f), 104 Stat. 2409, 2409–12 (1990). Section 176(c), as amended, integrates the Clean Air Act with the transportation planning process by conditioning federal approval and funding of transportation activities on their demonstrated compliance with applicable SIPs. 42 U.S.C. § 7506(c)(1) (1994). Prior to approval of applicable SIP control strategies, transportation activities must comply with interim requirements by showing that the proposed activity will contribute to emissions reductions. § 7506(c)(3).

In 1993, the EPA promulgated regulations establishing detailed "criteria and procedures for determining conformity under the statute." *See* 58 Fed.Reg. 62,188 (1993) (codified

at 40 C.F.R. §§ 51.390–51.464 (1996)); *see also* 42 U.S.C. § 7506(c)(4) (1994) (requiring EPA to promulgate regulations). In 1995, the EPA promulgated amendments to these regulations, including the grace period at issue here:

> *Grace period for new nonattainment areas.* For areas or portions of areas which have been in attainment for either ozone, CO, PM–10, or NO2 since 1990 and are subsequently redesignated to nonattainment for any of these pollutants, the provisions of this subpart shall not apply for such pollutant for 12 months following the date of final designation to nonattainment.

60 Fed.Reg. 57,179, 57,184 (1995) (final agency action amending regulations) (codified at 40 C.F.R. § 51.394(d) (1996)).

Appellant Sierra Club filed a timely petition for review of the grace period provision, arguing that it is contrary to the Clean Air Act. The EPA argues that Congress did not specifically address when newly designated nonattainment areas should become subject to the transportation conformity requirements, leaving this detail to the EPA, and defends the grace period as consistent with the statute and its goals.

## II. ANALYSIS

### A. *Standing*

 The standing of petitioner to pursue this judicial challenge was questioned at oral argument. Petitioner asserts, and the EPA agrees, that petitioner's standing cannot be doubted. We agree.

The transportation conformity requirements constitute a procedural rule under which transportation activities are reviewed to determine whether they conform to an area's SIP. This court recently discussed the three irreducible factors necessary for Article III standing—injury in fact, causation, and redressibility—in the context of procedural-rights cases in *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658 (D.C.Cir.1996) (en banc). "To demonstrate standing ... a procedural-rights plaintiff must show not only that the defendant's acts omitted some procedural requirement, but also that it is substantially probable that the procedural

breach will cause the essential injury to the plaintiff's own interest." *Id.* at 664–65. There is no doubt that the grace period subjects affected parties to the environmental exposures which the regulatory provisions suspended by the grace period seek to limit. It follows that the grace period will cause injury to Sierra Club members residing in newly designated nonattainment areas, and that this injury could be redressed by eliminating the grace period. Accordingly, Sierra Club has standing to petition for review of the grace period.

 The Government does not contest Sierra Club's standing. The Government's contention that the grace period will have no *significant* impact, because state regulatory provisions will ultimately minimize the impact of any injuries resulting from the challenged regulation, does not undermine Sierra Club's standing. Even if alternative protective measures might limit the harm caused by the relaxation of regulatory provisions, the existence of alternative "protective conditions" does not negate a party's standing to enforce statutorily mandated regulations. *See National Wildlife Fed'n v. Hodel,* 839 F.2d 694, 713 (D.C.Cir.1988) ("[T]he existence of other regulations that impose 'protective conditions,' thereby limiting the possible harm" alleged does not undermine petitioner's standing.). Moreover, Sierra Club members would suffer harm at least until remedial measures offsetting emissions from nonconforming activities were implemented, and this injury alone is sufficient to establish Sierra Club's standing.

### B. *Standard of Review*

In *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court set out the now familiar two-step test for reviewing an agency's interpretation of a statute. First, the reviewing court must ask "whether Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. at 2781. If so, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781. If,

however, "the statute is silent or ambiguous with respect to the specific issue," the reviewing court must defer to the agency's construction of the statute if it is reasonable. *Id.* at 843, 104 S.Ct. at 2782.

### C. The Grace Period is Contrary to the Plain Meaning of the Clean Air Act

■ This case is controlled by the first step of *Chevron.* In amendments to the Clean Air Act enacted shortly after the EPA published the final rule at issue here, Congress clarified that the transportation conformity requirements apply to nonattainment areas and maintenance areas. Pub.L. No. 104–59, tit. III, § 305(b), 109 Stat. 580 (Nov. 28, 1995) (codified at 42 U.S.C. § 7506(c)(5) (Supp.1995)). In so doing, Congress adopted the EPA's long-standing construction of the conformity requirements. *See EDF v. EPA,* 82 F.3d 451, 454 n. 2 (D.C.Cir.1996). While Congress took care to specify that areas remain subject to the conformity requirements following redesignation from "nonattainment" to "maintenance" status, *see* 42 U.S.C. § 7506(c)(5)(B) (Supp.1995), it did not provide any grace periods or other exemptions for areas redesignated from "attainment" to "nonattainment" status. This cannot be read to imply that the EPA can create such an exemption via administrative rule. Indeed, this court has consistently struck down administrative narrowing of clear statutory mandates. *See, e.g., Sierra Club v. EPA,* 992 F.2d 337, 343–45 (D.C.Cir.1993) (where statute required groundwater monitoring by "facilities potentially receiving ... [certain enumerated] wastes," EPA acted unlawfully when it required monitoring only at *larger* facilities receiving such wastes); *Hercules Inc. v. EPA,* 938 F.2d 276, 279–81 (D.C.Cir.1991) (where governing statute required federal agencies selling real property to notify the purchaser if hazardous waste had been stored on the property, EPA acted unlawfully in limiting notification to situations where the hazardous waste was stored "during the time the property was owned by the United States"). Accordingly, we hold that the grace period impermissibly creates an exception to the unqualified requirement in the statute that the federal government not approve a transportation activity unless that activity has complied with the conformity rules.

Although the statute's plain language is sufficient to support our finding that Congress intended a strict and broad ban on nonconforming activities in all nonattainment areas, it is also instructive to consider some of the well-known reasons underlying Congress's decision to enact the 1990 amendments to the statute. Prior to the 1990 amendments, the Act's transportation conformity requirements were "largely ... ignored by the agencies required to apply [them]." 136 CONG. REC. S16972 (daily ed. Oct. 27, 1990) (statement of Senator Baucus); *see also id.* (explaining that "no transportation plan has ever been disapproved under [section 176(c)], even in cities where mobile source emission growth is a major factor in preventing attainment of the NAAQS"). The initial compliance deadline in the 1970 Act (1975) and the extended deadlines set forth in the 1977 Amendments (1982 and 1987) passed unmet. *See* S. REP. No. 228, at 10–11 (1989). Recognizing that a large part of this failure was due to the propensity of the federal government to interfere with pollution control measures by approving, funding, or otherwise engaging in federal transportation activities which are inconsistent with applicable SIPs, *see* 136 CONG. REC. S16972 (daily ed. Oct. 27, 1990) (statement of Senator Baucus), Congress strengthened section 176(c) to eliminate noncompliance with the transportation conformity requirements by *conditioning* federal approval and funding of transportation activities in nonattainment and maintenance areas on their *demonstrated* compliance with the transportation conformity requirements. 42 U.S.C. § 7506(c)(1) (1994) (conditioning federal action on transportation activity's demonstrated compliance with the applicable SIP); § 7506(c)(3) (conditioning federal action on a showing that the proposed activity will contribute to emissions reductions where applicable SIP control strategies are not yet in place).

The Government offers three arguments in defense of the challenged regulation. First, the Government asserts that Congress included a similar twelve-month grace period

in subsection 176(c)(3)(B)(i), and thus the challenged grace period is not contrary to the Act. *See* 60 Fed.Reg. 57,179, 57,182 (1995); 60 Fed.Reg. 44,790, 44,796 (1995). Second, the Government argues that the challenged regulation is justified by subsection 176(c)(4)(B)(ii), which requires the EPA to determine "the appropriate frequency for making conformity determinations." *See* Respondent's Brief at 18–20. Third, the Government argues that this court's reasoning in *Sierra Club v. EPA,* 719 F.2d 436 (D.C.Cir. 1983), authorizes the EPA to promulgate the challenged grace period. *See* 60 Fed.Reg. at 57,182; 60 Fed.Reg. at 44,796. We reject all three justifications.

The Government's first two arguments confuse statutory provisions pertaining to the criteria and procedures for demonstrating *whether transportation activities in fact comply* with the transportation conformity requirements with the issue of *which transportation activities are required to comply.* First, the Government construes subsection 176(c)(3)(B)(i) as a twelve-month grace period similar to the challenged grace period. *See* 60 Fed.Reg. at 57,182; 60 Fed.Reg. at 44,796. When read in context, however, it becomes clear that subsection 176(c)(3)(B)(i) does not provide a twelve-month exemption from the conformity requirements but rather prescribes interim criteria and procedures for demonstrating the compliance of transportation activities in nonattainment and maintenance areas in the absence of an appropriate SIP control strategy. *See* 42 U.S.C. § 7506(c)(3) (1994) (providing interim requirements applicable until an appropriate SIP control strategy is in place); *see also* § 7506(c)(4)(C) (requiring each state to submit "a revision to its [SIP] that includes criteria and procedures for assessing the conformity of any [transportation activity] subject to the conformity requirements"). In contrast, the challenged grace period creates a twelve-month exemption from the transportation conformity requirements. *See* 40 C.F.R. § 51.394(d) (providing that "the provisions of this subpart *shall not apply* ... for 12 months following the date of final designation to nonattainment") (emphasis added). Thus, the so-called "grace-period" in subsection 176(c)(3)(B)(i) in no way resembles the

challenged grace period. Even if it did, however, it would not provide authority for the challenged grace period. On the contrary, had Congress provided some exemptions from the conformity requirements but not the particular exemption at issue here, this would militate *against* the validity of creating additional exemptions via administrative rule. *See, e.g., Sierra Club,* 719 F.2d at 453 (D.C.Cir.1983) (when a statute lists several specific exemptions to the general purpose, others should not be implied).

The Government's attempt to rely on subsection 176(c)(4)(B)(ii) also confuses statutory provisions pertaining to the manner of demonstrating conformity with the *applicability* of the conformity requirements. Section 176(c)(4) only authorizes the EPA to prescribe the manner and frequency of determining compliance with section 176, and nothing in this section can be properly construed as authorizing the Agency to exempt transportation activities in some nonattainment areas from the conformity requirements. Subsection 176(c)(4)(A) directs the agency to "promulgate criteria and procedures for demonstrating and assuring conformity"of transportation activities subject to the conformity requirements. 42 U.S.C. § 7506(c)(4)(A) (1994). Subsection 176(c)(4)(B)(ii) further requires the EPA to "address the appropriate frequency for making conformity determinations," provided that such determinations are not "less frequent than every three years." § 7506(c)(4)(B)(ii).

The EPA attempts to support its argument that subsection 176(c)(4)(B)(ii) authorizes the challenged grace period by comparing the grace period at issue here with the "grandfather" provision upheld in *EDF v. EPA,* 82 F.3d 451 (D.C.Cir.1996). However, *EDF* does not support the EPA's argument. The regulations at issue in *EDF* were challenged on the ground that they "exempt from the conformity determination requirements ... [transportation] projects that have undergone recent National Environmental Policy Act (NEPA) analyses ... within the preceding three years." 82 F.3d at 456; *see also* 40 C.F.R. § 51.394(c)(1) (1994). This court reasoned that, since section 176(c)(4) clearly au-

thorizes the EPA to determine the criteria and procedures for demonstrating conformity as well as the frequency of conformity determinations, the EPA's substitution of NEPA analyses for the newly-promulgated conformity requirements, so long as the NEPA analysis was performed within three years, was a proper exercise of the authority expressly delegated to the EPA by the statute. *Id.* at 456–47.

The transportation activities at issue in *EDF* were in nonattainment areas throughout the relevant period and thus were required to comply with the transportation conformity requirements. Significantly, the *EDF* court noted that the challenged rules "require generally that conformity determinations for covered projects be made before any federal action is taken on them." *Id.* at 456. The only thing that had changed was the specific criteria and procedures used to demonstrate conformity, in that transportation activities which had recently undergone a NEPA analysis were allowed to proceed, using the recent NEPA analysis as a reasonable equivalent to the conformity determination required under section 176(c). By allowing such a substitution, the regulation upheld in *EDF* merely provided a three-year period of repose for a transportation activity which had already undergone an extensive environmental impact review.

In contrast, this case involves the applicability of the Act's transportation conformity requirements following the revision of an area's attainment status. Under the Act, designation of an area as nonattainment triggers the applicability of the transportation conformity requirements. *See* 42 U.S.C. § 7506(c)(5) (Supp.1995). Unlike in *EDF*, the regulation at issue here does not pertain merely to the specific procedures and criteria used to determine compliance or to *how often* an activity must go through a compliance determination process, but rather whether an activity must be found to comply *at all* before it can be approved or funded. Indeed, transportation activities which are exempt from the conformity requirements under the disputed grace period may not have undergone *any* environmental impact review. While the holding in *EDF* rested squarely on the Act's

delegation of authority to the EPA to specify the criteria and procedures for determining conformity as well as the frequency of conformity determinations, the Act does not authorize the EPA to limit the applicability of the conformity requirements by exempting some nonattainment areas, even for a limited period of time. Thus, neither the statutory provision at issue in *EDF* nor the Court's reasoning in *EDF* supports EPA's claim of authority to promulgate the regulation challenged here.

The EPA's reliance on this court's reasoning in *Sierra Club v. EPA,* 719 F.2d 436 (D.C.Cir.1983), as authority for the challenged regulation is also without merit. *Sierra Club* involved the EPA's duty to apply retroactively a regulation promulgated to implement a statutory mandate. To resolve this issue, this court applied the same test which we have applied to determine the limits of an agency's power to apply a regulation retroactively. *Id.* at 467. The factors relied on in *Sierra Club* echo the anti-retroactivity principles traditionally considered when evaluating whether legislation should be applied retroactively. *Cf. Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (discussing evolution and application of anti-retroactivity principles).

Unlike *Sierra Club* and the cases on which it relies, however, this case involves an administrative agency's authority to limit the *prospective,* rather than retroactive, application of regulations implementing a statutory mandate. The Government acknowledges that this case differs from *Sierra Club.* 60 Fed.Reg. 57,179, 57,182 (1995). The Government erroneously dismisses the importance of this distinction, however, arguing that the legal analysis articulated in *Sierra Club* "applies equally to grandfathering from new requirements." *Id.* The Government asserts that the anti-retroactivity principles applied in *Sierra Club* justify the challenged grace period because "[i]mmediate application of all conformity requirements ... would seriously prejudice the affected areas, which have relied on their status as attainment areas exempt from conformity and have not previously conducted the analyses necessary for conformity determinations." Respon-

dent's Br. at 23. This is a ridiculous claim. This court has never treated the type of harm alleged by the Government as a sort of "retroactivity" violating any legal standard. *See DIRECTV, Inc. v. FCC,* 110 F.3d 816, 826 (D.C.Cir.1997) (rejecting claim that, because petitioner had expended millions of dollars in reliance on prior regulatory scheme, change in regulatory scheme was "secondarily retroactive" as applied to petitioner and that, therefore, anti-retroactivity principles should apply to exempt petitioner from new regulation); *see also Landgraf,* 511 U.S. at 269–70 n. 24, 114 S.Ct. at 1499 n. 24 ("Even uncontroversially prospective statutes may unsettle expectations and impose burdens on past conduct[, for example,] a new property tax or zoning regulation may upset the reasonable expectations that prompted those affected to acquire property," but this does not render the application of new laws invalid.).

The absurdity of the EPA's argument is seen in the fact that the challenged grace period is not limited only to those regulated entities whose expectations arguably were adversely affected by the 1990 amendments to the Act. EPA regulations promulgated in 1993 to implement the 1990 amendments did not include any grace periods for designated nonattainment areas. *See* 58 Fed.Reg. 62,-188 (1993). Yet, under the EPA's 1995 amendment to its 1993 regulations, regulated entities that are now fully on notice of the consequences of nonattainment would be given an exemption from conformity requirements in clear defiance of the statute. EPA's attempt to justify this position falls flat.

*Sierra Club* and the cases on which it relied involved agencies' duty or authority to apply regulations retroactively. In contrast, this case involves an agency's effort to create exemptions from a prospective statutory mandate. Absent a showing of retroactivity, the challenged exemptions must be treated no differently than any other administrative exemption from a categorical statutory mandate, and thus *Sierra Club* is inapposite here. The Government's argument that the line drawn between retrospective and prospective laws can be disregarded where, as here, the exemption from the conformity requirements—termed "grandfathering" by the Government—is limited to a one-year period, *see* 60 Fed.Reg. at 57,182, is without merit. Although it is certainly within Congress's power to provide such grandfathering provisions, neither administrative agencies nor courts may do so in the absence of clear statutory authority. Nothing in *Sierra Club* suggests the contrary.

### III. CONCLUSION

We hold that EPA's proposed grace period exempting designated nonattainment areas from the Clean Air Act's transportation conformity requirements violates the plain terms of the Act and, therefore, is unlawful. Accordingly, the petition for review is granted.

*So ordered.*