RANDOLPH, Senior Circuit Judge,
dissenting:
The majority opinion treats this case as if it were facing a linguistic puzzle. The court’s solution, we are told, is better than EPA’s. And so the court sets aside two important aspects of EPA’s regulations implementing its 2008 ozone standards. The court’s decision and its reasoning are, I believe, mistaken.
The first subject of the majority opinion is EPA’s judgment about when future attainment deadlines begin running. The Clean Air Act says nothing about when *474 EPA should start the clock after the agency has issued new, stricter National Ambient Air Quality Standards (NAAQS) for ozone. The Supreme Court identified this timing gap in Whitman v. American Trucking Ass’ns, 531 U.S. 457, 483-84, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001), and concluded that a reviewing court must defer to EPA’s reasonable resolution of the statutory uncertainty. Id. at 484, 121 S.Ct. 903; see also South Coast Air Quality Mgmt. Dist. v. EPA, 472 F.3d 882, 896 (D.C.Cir.2006), clarified on denial of reh’g, 489 F.3d 1245 (D.C.Cir.2007).
The majority disagrees with EPA’s decision to run the deadlines from December 31 rather than from July 20, 2012, when 2008 NAAQS designations became effective. Exactly why the majority disagrees with EPA is hard to discern. In large part, the majority’s theory appears to rely on EPA’s statement a decade ago that it had no “authority to change the attainment dates to November or December of the attainment year.” See Maj. Op. at 468. As the majority sees it, EPA should be held to the concession that it lacked any statutory authority to run the deadlines from a date other than the designation date.[1]
Regardless of what EPA meant by its decade-old remark, it has made no such concession in this case. EPA has thoroughly explained why the end-of-year date is not only preferable but also perfectly consistent with the Clean Air Act. See Resp’t Br. at 31-34. EPA’s judgment is in harmony with Congress’s intent as expressed in Table 1. The majority’s view is not. EPA justified its decision on the basis that “it provides nonattainment areas with the same number of post-designation ozone seasons to demonstrate attainment as similarly-classified areas had under the 1990 Amendments.” Resp’t Br. at 31 (citing 77 Fed.Reg. 30,160, 30,166 (May 21, 2012)). Pursuant to the 1990 Amendments, “marginal nonattainment areas had three full ozone seasons (1991-1993) between the date of enactment and the November 15, 1993 deadline to attain the NAAQS.” Id. at 31-32. I therefore disagree with the majority’s conclusion that this interpretation “lacks any grounding in the statute,” and “runs counter to all indicia of congressional intent.” Maj. Op. at 468. What is not grounded in the statute is the majority’s notion that once EPA issues its designations of areas, the attainment deadlines must begin running.[2]
*475 As to what may appear to be EPA’s contrary stance years ago, an “initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis.” Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 863-64, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Here, EPA was faced with the task of adapting Table l’s timeframes, which were effective in November 1990, to the July 2012 designations for the new ozone NAAQS. Those designations fell in the middle of an ozone season — “a variable Congress did not face at the time it enacted the [Clean Air Act] Amendments in late 1990.” Resp’t Br. at 33. As EPA notes in its brief, in the early 1990s, EPA allowed marginal locations with year-round ozone seasons to extend the deadline until the end of the calendar year so that those areas could submit data for three full ozone seasons. See Resp’t Br. at 32 n. 8. Because the statute is ambiguous about this subject and because “[attainment can only be demonstrated with monitoring data from three full and consecutive ozone seasons, which, for areas with year-round ozone seasons, means three full calendar years of monitoring data,” Resp’t Br. at 34 n. 9 (citing 77 Fed.Reg. 8,197, 8,204 (Feb. 14, 2012)), EPA’s accommodation is a reasonable interpretation of the Clean Air Act entitled to judicial deference. See, e.g., Envtl. Def. v. EPA, 489 F.3d 1320, 1329 (D.C.Cir.2007). In short, EPA’s explanation (and its longstanding practice for areas with year-round ozone seasons) is more than sufficient. An agency “need not demonstrate to a court’s satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better.... ” FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009); see also White Stallion Energy Ctr., LLC v. EPA, 748 F.3d 1222, 1235 (D.C.Cir.2014) (per curiam).
This brings me to the second aspect of the implementing regulations the majority sets aside — EPA’s revocation of the 1997 ozone standard for transportation conformity purposes. In South Coast Air Quality Management District v. EPA, 472 F.3d 882, the court upheld EPA’s revocation of a prior NAAQS for ozone when it issued a new, stricter ozone NAAQS, as it did here. Id. at 899-900; see also Natural Res. Def. Council v. EPA, 643 F.3d 311, 315-16 (D.C.Cir.2011). But in this case, the majority holds that EPA lacked the authority to revoke the prior NAAQS for transportation conformity purposes because it did not revoke the NAAQS in its entirety. See Maj. Op. at 470-72.[3]
NRDC never advanced this argument in its opening brief. EPA, in its responsive brief, never mentioned it either. Although *476 NRDC’s reply brief disputes EPA’s interpretation of South Coast and argues that South Coast does not authorize the EPA to revoke a NAAQS in part, that terse remark did not preserve the argument. See Reply Br. at 20. For good reason, we do not permit issues to “be raised for the first time in a reply brief.” Rollins Envtl. Servs. v. EPA, 937 F.2d 649, 652 n. 2 (D.C.Cir.1991) (citing McBride v. Merrell Dow & Pharm., Inc., 800 F.2d 1208, 1210-11 (D.C.Cir.1986)). In addition, the argument in NRDC’s reply brief is that EPA misinterpreted South Coast, not that the statute bars EPA from revoking the transportation conformity requirements because it did not revoke the entire 1997 NAAQS. See Reply Br. at 20.[4]
The majority’s theory was never presented to EPA during the rulemaking either. For that reason, EPA said not a word about it in the lengthy preamble to the rule.[5] The Clean Air Act contains an explicit exhaustion requirement: “Only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review.” 42 U.S.C. § 7607(d)(7)(B) (emphasis added).[6] We have repeatedly applied a “strict[ ]” interpretation of the exhaustion requirement “to ensure that EPA has an opportunity to respond to every challenge” and so that “the court enjoys the benefit of the agency’s expertise and possibly avoids addressing some of the challenges unnecessarily.” Motor & Equip. Mfrs. Ass’n v. Nichols, 142 F.3d 449, 462 (D.C.Cir.1998); see also Util. Air Regulatory Grp. v. EPA, 744 F.3d 741, 747 (D.C.Cir.2014); Natural Res. Def. Council v. EPA, 559 F.3d 561, 563 (D.C.Cir.2009).
In this case we have not had the benefit of EPA’s response to the argument the majority sponsors, not in EPA’s rulemaking proceedings — and, I should add, not in the briefs in this court, or in the oral argument before us. I therefore believe the majority erred in reaching out to decide the case on a theory of its own devising.
Even if the majority’s revocation-in-part argument were properly before us, I believe EPA’s interpretation of the Clean Air Act is permissible. The majority relies *477 upon Sierra Club v. EPA (Sierra Club-conformity), 129 F.3d 137, 138, 140 (D.C.Cir.1997), to support its conclusion that EPA lacks authority to revoke the conformity requirements alone. See Maj. Op. at 471-72. Sierra Club-conformity held impermissible a grace period during which time newly designated nonattainment areas were exempt from conformity requirements. The Clean Air Act, the court wrote, “does not provide for any grace periods or other exemptions from the conformity requirements for areas designated as nonattainment areas, nor does it authorize the EPA to create such exemptions.” Sierra Club-conformity, 129 F.3d at 138. The opinion is silent about revoking transportation conformity requirements themselves.
On that score, the Act indicates that conformity requirements apply “only” in nonattainment and maintenance areas, not in areas that have been removed from such status by the revocation of the underlying NAAQS. 42 U.S.C. § 7506(c)(5). We recognized EPA’s authority to revoke existing NAAQS when it adopts a new standard for the same pollutant in South Coast, 472 F.3d at 899. The implication of South Coast is that transportation conformity requirements are not graved in stone. EPA can alter them, and the existence of the “anti-backsliding” provision of the Clean Air Act shows that Congress anticipated the revocation of some restrictions and their replacement with weaker controls. See id. at 899-900, 42 U.S.C. § 7502(e). ,Because I believe, as South Coast determined, that the Act does not prohibit EPA’s revocation of the transportation conformity requirements, I disagree with the majority’s view that an objective observer, looking only at the statutory language, would conclude that EPA violated the Act.
Beyond this, EPA had good reason for revoking the 1997 transportation conformity requirements. EPA explains that “[i]f the 1997 ozone NAAQS were to remain in place after conformity applies for the 2008 ozone NAAQS, ... areas that are currently nonattainment or maintenance for the 1997 ozone NAAQS and -will be designated nonattainment for the 2008 ozone NAAQS would be required to implement the transportation conformity program for both ozone NAAQS concurrently.” 77 Fed.Reg. at 30,167-68. “This could lead to unnecessary complexity,” id. at 30,168, whereas revoking the 1997 ozone NAAQS “would bring certainty to the transportation planning process in ozone nonattainment and maintenance areas.” Id. at 30,167. The majority claims that the 2008 rule leaves a gap in conformity coverage for some 2008 attainment areas. Maj. Op. at 472-73. But, as EPA notes, either these so-called “orphan areas” had attained the 1997 standard at the time EPA promulgated the 2008 standard, or, even if they had not, they would not create a concern because “the new NAAQS does not represent a ‘relaxation’ of an existing NAAQS” and is, in fact, stricter than the 1997 requirements. Resp’t Br. at 48 n. 15. If these areas are in attainment for new, stricter standards, there is no reason to force them to conform to prior, weaker ones to prevent backsliding. See South Coast, 472 F.3d at 900.
A few final points. Notably absent from the majority opinion is any discussion of how exactly EPA and the States are expected to implement the majority’s decision. We do not know whether the majority intends that attainment deadlines set years ago must now be retroactively shortened as a result of court order. Still less do we know what sort of disarray this will cause throughout the country. And we do not know whether State and local transportation plans — plans approved and im *478 plemented, presumably after large effort and at great expense must be retroactively disapproved. These and other problems are bound to arise as a result of what I consider a mistake in judicial analysis.
For these reasons, I respectfully dissent.

. The Clean Air Act provides that areas designated nonattainment areas for ozone “shall be classified at the time of such designation, under table 1....’’ 42 U.S.C. § 7511(a)(1). Table 1 establishes classifications and attainment dates for nonattainment areas with a "design value” — an area’s ozone pollution level over three consecutive calendar years— that exceeded the one-hour NAAQS. Table 1 also establishes five classifications that correspond to design value ranges, and it establishes attainment dates for each classification running from the date of enactment of the 1990 Amendments (November 15, 1990), not from the date of designation of the nonattainment areas. Id.
When Congress adopted the 1990 Amendments, EPA had already designated large areas of the country — comprising half the population — as nonattaining, that is, as having unacceptably high levels of ozone. See S.Rep. No. 101-228 (1989), as reprinted in 1990 U.S.C.C.A.N. 3385, 3389. These nonattaining areas had already been engaged in pollution control efforts to comply with environmental deadlines that had already passed. See South Coast, 472 F.3d at 886-87. Accordingly, those nonattaining areas had more time to reach attainment than the three years stipulated for even marginally nonattaining areas under the 1990 Amendments. This history shows that EPA’s deadlines were never as firm or limited as the majority would like to believe.

. There is evidence, as EPA notes, that “Congress did not invariably consider a designation or classification as the trigger date for NAAQS attainment deadlines” regardless of circumstances. Resp’t Br. at 29. First, Table *475 1 could have simply measured the attainment periods from the date of designation “but Congress instead chose to run the attainment periods from the date of enactment of the 1990 Amendments.” Resp't Br. at 27. Second, other NAAQS attainment deadlines are pegged to different events. See, e.g., 42 U.S.C. § 75lie (giving "transitional areas” designated nonattainment as of November 15, 1990 until December 31, 1991 to attain ozone standard).

. As the majority notes, EPA has published a proposed rule that would revoke the 1997 ozone standard for all purposes. See Maj. Op. at 420; Implementation of the 2008 National Ambient Air Quality Standards for Ozone: State Implementation Plan Requirements, 78 Fed.Reg. 34,178 (June 6, 2013). While the rule is not yet final, it could very well undercut the distinction between revoking in whole and revoking in part on which the majority relies.

. NRDC’s opening brief argues that the removal of the transportation conformity requirements for the 1997 NAAQS contravenes the Clean Air Act and that "under the guise of a 'partial revocation' of the 1997 NAAQS, EPA is claiming the power to pick and choose which parts of the Clean Air Act apply to nonattainment and maintenance areas.” Pet. Br. at 37. But this argument is quite different from the argument NRDC advances in its reply brief, which NRDC doubtless waived anyway. See Cement Kiln Recycling Coal. v. EPA, 255 F.3d 855, 869 (D.C.Cir.2001) (per curiam) ("A litigant does not properly raise an issue by addressing it in a 'cursory fashion’ with only 'bare-bones arguments.’ ”) (quoting Wash. Legal Clinic for the Homeless v. Barry, 107 F.3d 32, 39 (D.C.Cir.1997)).

. During the comment period, the group Earthjustice stated that "EPA has no authority to suspend [transportation conformity requirements] by fiat,” but as this conclusory comment itself indicates, this did not present the majority’s theory with any specificity. J.A. 314.

.It is of no moment whether 42 U.S.C. § 7607(d)(7)(B) is jurisdictional, contra EPA v. EME Homer City Generation, L.P.,-U.S. -, 134 S.Ct. 1584, 1602, 188 L.Ed.2d 775 (2014), or quasi-jurisdictional, see EEOC v. Fed. Labor Relations Auth. ("FLRA ”), 476 U.S. 19, 24, 106 S.Ct. 1678, 90 L.Ed.2d 19 (1986). The designation jurisdictional would be significant if the agency could have, but did not, raise the objection (that is, waived the objection) but the court nevertheless invoked it, as in FLRA. Here EPA did not interpose a § 7607(d)(7)(B) objection to the sort of argument the majority embraces, but it could not have waived the objection for the quite apparent reason that petitioner’s brief never made the argument.