(Slip Opinion) OCTOBER TERM, 2013 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ENVIRONMENTAL PROTECTION AGENCY ET AL. *v.* EME HOMER CITY GENERATION, L. P., ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 12–1182.  Argued December 10, 2013—Decided April 29, 2014\*

Congress and the Environmental Protection Agency (EPA or Agency) have, over the course of several decades, made many efforts to deal with the complex challenge of curtailing air pollution emitted in upwind States, but causing harm in other, downwind States. As relevant here, the Clean Air Act (CAA or Act) directs EPA to establish national ambient air quality standards (NAAQS) for pollutants at levels that will protect public health. 42 U. S. C. §§7408, 7409. Once EPA settles on a NAAQS, the Agency must designate "nonattainment" areas, *i.e.,* locations where the concentration of a regulated pollutant exceeds the NAAQS. §7407(d). Each State must submit a State Implementation Plan, or SIP, to EPA within three years of any new or revised NAAQS. §7410(a)(1). From the date EPA determines that a State SIP is inadequate, the Agency has two years to promulgate a Federal Implementation Plan, or FIP. §7410(c)(1). Among other components, the CAA mandates SIP compliance with the Good Neighbor Provision, which requires SIPs to "contain adequate provisions . . . prohibiting . . . any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will . . . contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any . . . [NAAQS]." §7410(a)(2)(D)(i).

Several times over the past two decades, EPA has attempted to delineate the Good Neighbor Provision's scope by identifying when

———————

\*Together with No. 12–1183, *American Lung Association et al.* v. *EME Homer City Generation, L. P., et al.,* also on certiorari to the same court.

upwind States "contribute significantly" to nonattainment downwind. The D. C. Circuit found fault with the Agency's 2005 attempt, the Clean Air Interstate Rule, or CAIR, which regulated both nitrogen oxide ($NO_X$) and sulfur dioxide ($SO_2$) emissions, the gasses at issue here. The D. C. Circuit nevertheless left CAIR temporarily in place, while encouraging EPA to act with dispatch in dealing with problems the court had identified.

EPA's response to that decision is the Cross-State Air Pollution Rule (Transport Rule), which curbs $NO_X$ and $SO_2$ emissions in 27 upwind States to achieve downwind attainment of three NAAQS. Under the Transport Rule, an upwind State "contribute[d] significantly" to downwind nonattainment to the extent its exported pollution both (1) produced one percent or more of a NAAQS in at least one downwind State and (2) could be eliminated cost-effectively, as determined by EPA. Upwind States are obliged to eliminate only emissions meeting both of these criteria. Through complex modeling, EPA created an annual emissions "budget" for each regulated State upwind, representing the total quantity of pollution an upwind State could produce in a given year under the Transport Rule. Having earlier determined each regulated State's SIP to be inadequate, EPA, contemporaneous with the Transport Rule, promulgated FIPs allocating each State's emissions budgets among its in-state pollution sources.

A group of state and local governments (State respondents), joined by industry and labor groups (Industry respondents), petitioned for review of the Transport Rule in the D. C. Circuit. The court vacated the rule in its entirety, holding that EPA's actions exceeded the Agency's statutory authority in two respects. Acknowledging that EPA's FIP authority is generally triggered when the Agency disapproves a SIP, the court was nevertheless concerned that States would be incapable of fulfilling the Good Neighbor Provision without prior EPA guidance. The court thus concluded that EPA must give States a reasonable opportunity to allocate their emission budgets before issuing FIPs. The court also found the Agency's two-part interpretation of the Good Neighbor Provision unreasonable, concluding that EPA must disregard costs and consider exclusively each upwind State's physically proportionate responsibility for air quality problems downwind.

*Held*:

1. The CAA does not command that States be given a second opportunity to file a SIP after EPA has quantified the State's interstate pollution obligations. Pp. 13–18.

(a) The State respondents do not challenge EPA's disapproval of any particular SIP. Instead, they argue that, notwithstanding these disapprovals, the Agency was still obliged to grant upwind States an

additional opportunity to promulgate adequate SIPs after EPA had set the State's emission budget. This claim does not turn on the validity of the prior SIP disapprovals, but on whether the CAA requires EPA do more than disapprove a SIP to trigger the Agency's authority to issue a FIP. Pp. 13–14.

(b) The CAA's plain text supports the Agency: Disapproval of a SIP, without more, triggers EPA's obligation to issue a FIP. The statute sets precise deadlines for the States and EPA. Once EPA issues any new or revised NAAQS, a State "shall" propose a SIP within three years, 42 U. S. C. §7410(a)(1), and that SIP "shall" include, *inter alia*, provisions adequate to satisfy the Good Neighbor Provision, §7410(a)(2). If the EPA finds a SIP inadequate, the Agency has a statutory duty to issue a FIP "at any time" within two years. §7410(c)(1). However sensible the D. C. Circuit's exception to this strict time prescription may be, a reviewing court's "task is to apply the text [of the statute], not to improve upon it." *Pavelic & LeFlore* v. *Marvel Entertainment Group, Div. of Cadence Industries Corp.*, 493 U. S. 120, 126. Nothing in the Act differentiates the Good Neighbor Provision from the several other matters a State must address in its SIP. Nor does the Act condition the duty to promulgate a FIP on EPA's having first quantified an upwind State's good neighbor obligations. By altering Congress' SIP and FIP schedule, the D. C. Circuit allowed a delay Congress did not order and placed an information submission obligation on EPA Congress did not impose. Pp. 14–17.

(c) The fact that EPA had previously accorded upwind States a chance to allocate emission budgets among their in-state sources does not show that the Agency acted arbitrarily by refraining to do so here. EPA retained discretion to alter its course provided it gave a reasonable explanation for doing so. *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 42. Here, the Agency had been admonished by the D. C. Circuit to act with dispatch in amending or replacing CAIR. Endeavoring to satisfy that directive, EPA acted speedily, issuing FIPs and the Transport Rule contemporaneously. Pp. 17–18.

2. EPA's cost-effective allocation of emission reductions among upwind States is a permissible, workable, and equitable interpretation of the Good Neighbor Provision. Pp. 18–31.

(a) Respondents' attack on EPA's interpretation of the Good Neighbor Provision is not foreclosed by §7607(d)(7)(B), which provides that "[o]nly an objection to a rule . . . raised with reasonable specificity during the period for public comment . . . may be raised during judicial review." Even assuming that respondents failed to object to the Transport Rule with "reasonable specificity," that lapse is not jurisdictional. Section 7607(d)(7)(B) is a "mandatory," but not

"jurisdictional," rule, see *Arbaugh* v. *Y & H Corp.*, 546 U. S. 500, 510, which speaks to a party's procedural obligations, not a court's authority, see *Kontrick* v. *Ryan*, 540 U. S. 443, 455. Because EPA did not press this argument unequivocally before the D. C. Circuit, it does not pose an impassable hindrance to this Court's review. Pp. 18–19.

(b) This Court routinely accords dispositive effect to an agency's reasonable interpretation of ambiguous statutory language. The Good Neighbor Provision delegates authority to EPA at least as certainly as the CAA provisions involved in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837. EPA's authority to reduce upwind pollution extends only to those "amounts" of pollution that "contribute significantly to nonattainment" in downwind States. §7410(a)(2)(D)(i). Because a downwind State's excess pollution is often caused by multiple upwind States, however, EPA must address how to allocate responsibility among multiple contributors. The Good Neighbor Provision does not dictate a method of apportionment. Nothing in the provision, for example, directs the proportional allocation method advanced by the D. C. Circuit, a method that works neither mathematically nor in practical application. Under *Chevron,* Congress' silence effectively delegates authority to EPA to select from among reasonable options. See *United States* v. *Mead Corp.*, 533 U. S. 218, 229.

EPA's chosen allocation method is a "permissible construction of the statute." *Chevron*, 467 U. S., at 843. The Agency, tasked with choosing which among equal "amounts" to eliminate, has chosen sensibly to reduce the amount easier, *i.e.,* less costly, to eradicate. The Industry respondents argue that the final calculation cannot rely on costs, but nothing in the Good Neighbor Provision's text precludes that choice. And using costs in the Transport Rule calculus is an efficient and equitable solution to the allocation problem the Good Neighbor Provision compels the Agency to address. Efficient because EPA can achieve the same levels of attainment, *i.e.,* of emission reductions, the proportional approach aims to achieve, but at a much lower overall cost. Equitable because, by imposing uniform cost thresholds on regulated States, EPA's rule subjects to stricter regulation those States that have done less in the past to control their pollution. Pp. 20–28.

(c) Wholesale invalidation of the Transport Rule is not justified by either of the D. C. Circuit's remaining objections: that the Transport Rule leaves open the possibility that a State might be compelled to reduce emissions beyond the point at which every affected downwind State is in attainment, so-called "over-control"; and that EPA's use of costs does not foreclose the possibility that an upwind State would be required to reduce its emissions by so much that

Syllabus

the State would be placed below the one-percent mark EPA set as the initial threshold of "significan[ce]." First, instances of "over-control" in particular downwind locations may be incidental to reductions necessary to ensure attainment elsewhere. As the Good Neighbor Provision seeks attainment in *every* downwind State, however, exceeding attainment in one State cannot rank as "over-control" unless unnecessary to achieving attainment in *any* downwind State. Second, the EPA must have leeway in fulfilling its statutory mandate to balance the possibilities of over-control and "under-control," *i.e.,* to maximize achievement of attainment downwind. Finally, in a voluminous record, involving thousands of upwind-to-downwind linkages, respondents point to only a few instances of "unnecessary" emission reductions, and even those are contested by EPA. Pp. 28–31.

696 F. 3d 7, reversed and remanded.

GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined. ALITO, J., took no part in the consideration or decision of the cases.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 12–1182 and 12–1183

_____

ENVIRONMENTAL PROTECTION AGENCY ET AL.,
PETITIONERS

12–1182                  *v.*

EME HOMER CITY GENERATION, L. P., ET AL.; AND

AMERICAN LUNG ASSOCIATION ET AL.,
PETITIONERS

12–1183                  *v.*

EME HOMER CITY GENERATION, L. P., ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[April 29, 2014]

JUSTICE GINSBURG delivered the opinion of the Court.

These cases concern the efforts of Congress and the Environmental Protection Agency (EPA or Agency) to cope with a complex problem: air pollution emitted in one State, but causing harm in other States. Left unregulated, the emitting or upwind State reaps the benefits of the economic activity causing the pollution without bearing all the costs. See Revesz, Federalism and Interstate Environmental Externalities, 144 U. Pa. L. Rev. 2341, 2343 (1996). Conversely, downwind States to which the pollution travels are unable to achieve clean air because of the influx of out-of-state pollution they lack authority to control. See S. Rep. No. 101–228, p. 49 (1989). To tackle the

problem, Congress included a Good Neighbor Provision in the Clean Air Act (Act or CAA). That provision, in its current phrasing, instructs States to prohibit in-state sources "from emitting any air pollutant in amounts which will . . . contribute significantly" to downwind States' "nonattainment . . . , or interfere with maintenance," of any EPA-promulgated national air quality standard. 42 U. S. C. §7410(a)(2)(D)(i).

Interpreting the Good Neighbor Provision, EPA adopted the Cross-State Air Pollution Rule (commonly and hereinafter called the Transport Rule). The rule calls for consideration of costs, among other factors, when determining the emission reductions an upwind State must make to improve air quality in polluted downwind areas. The Court of Appeals for the D. C. Circuit vacated the rule in its entirety. It held, 2 to 1, that the Good Neighbor Provision requires EPA to consider only each upwind State's physically proportionate responsibility for each downwind State's air quality problem. That reading is demanded, according to the D. C. Circuit, so that no State will be required to decrease its emissions by more than its ratable share of downwind-state pollution.

In *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837 (1984), we reversed a D. C. Circuit decision that failed to accord deference to EPA's reasonable interpretation of an ambiguous Clean Air Act provision. Satisfied that the Good Neighbor Provision does not command the Court of Appeals' cost-blind construction, and that EPA reasonably interpreted the provision, we reverse the D. C. Circuit's judgment.

## I

### A

Air pollution is transient, heedless of state boundaries. Pollutants generated by upwind sources are often transported by air currents, sometimes over hundreds of miles,

to downwind States. As the pollution travels out of state, upwind States are relieved of the associated costs. Those costs are borne instead by the downwind States, whose ability to achieve and maintain satisfactory air quality is hampered by the steady stream of infiltrating pollution.

For several reasons, curtailing interstate air pollution poses a complex challenge for environmental regulators. First, identifying the upwind origin of downwind air pollution is no easy endeavor. Most upwind States propel pollutants to more than one downwind State, many downwind States receive pollution from multiple upwind States, and some States qualify as both upwind and downwind. See Brief for Federal Petitioners 6. The overlapping and interwoven linkages between upwind and downwind States with which EPA had to contend number in the thousands.[1]

Further complicating the problem, pollutants do not emerge from the smokestacks of an upwind State and uniformly migrate downwind. Some pollutants stay within upwind States' borders, the wind carries others to downwind States, and some subset of that group drifts to States without air quality problems. "The wind bloweth where it listeth, and thou hearest the sound thereof, but canst not tell whence it cometh, and whither it goeth." The Holy Bible, John 3:8 (King James Version). In crafting a solution to the problem of interstate air pollution, regulators must account for the vagaries of the wind.

Finally, upwind pollutants that find their way downwind are not left unaltered by the journey. Rather, as the gases emitted by upwind polluters are carried downwind, they are transformed, through various chemical processes, into altogether different pollutants. The offending gases

---

[1] For the rule challenged here, EPA evaluated 2,479 separate linkages between downwind and upwind States. Brief for Federal Petitioners 6.

at issue in these cases—nitrogen oxide ($NO_X$) and sulfur
dioxide ($SO_2$)—often develop into ozone and fine particu-
late matter ($PM_{2.5}$) by the time they reach the atmos-
pheres of downwind States. See 76 Fed. Reg. 48222–
48223 (2011). See also 69 Fed. Reg. 4575–4576 (2004)
(describing the components of ozone and $PM_{2.5}$). Down-
wind air quality must therefore be measured for ozone and
$PM_{2.5}$ concentrations. EPA's chore is to quantify the
amount of upwind gases ($NO_X$ and $SO_2$) that must be
reduced to enable downwind States to keep their levels of
ozone and $PM_{2.5}$ in check.

## B

Over the past 50 years, Congress has addressed inter-
state air pollution several times and with increasing rigor.
In 1963, Congress directed federal authorities to "encour-
age cooperative activities by the States and local govern-
ments for the prevention and control of air pollution." 77
Stat. 393, 42 U. S. C. §1857a (1964 ed.). In 1970, Congress
made this instruction more concrete, introducing features
still key to the Act. For the first time, Congress directed
EPA to establish national ambient air quality standards
(NAAQS) for pollutants at levels that will protect public
health. See 84 Stat. 1679–1680, as amended, 42 U. S. C.
§§7408, 7409 (2006 ed.). Once EPA settles on a NAAQS,
the Act requires the Agency to designate "nonattainment"
areas, *i.e.,* locations where the concentration of a regulated
pollutant exceeds the NAAQS. §7407(d).

The Act then shifts the burden to States to propose
plans adequate for compliance with the NAAQS. Each
State must submit a State Implementation Plan, or SIP,
to EPA within three years of any new or revised NAAQS.
§7410(a)(1). If EPA determines that a State has failed to
submit an adequate SIP, either in whole or in part, the Act
requires the Agency to promulgate a Federal Implementa-
tion Plan, or FIP, within two years of EPA's determina-

tion, "unless the State corrects the deficiency" before a FIP is issued. §7410(c)(1).[2]

The Act lists the matters a SIP must cover. Among SIP components, the 1970 version of the Act required SIPs to include "adequate provisions for intergovernmental cooperation" concerning interstate air pollution. §110(a)(2)(E), 84 Stat. 1681, 42 U. S. C. §1857c–5(a)(2)(E). This statutory requirement, with its text altered over time, has come to be called the Good Neighbor Provision.

In 1977, Congress amended the Good Neighbor Provision to require more than "cooperation." It directed States to submit SIPs that included provisions "adequate" to "prohibi[t] any stationary source within the State from emitting any air pollutant in amounts which will . . . prevent attainment or maintenance [of air quality standards] by any other State." §108(a)(4), 91 Stat. 693, 42 U. S. C. §7410(a)(2)(E) (1976 ed., Supp. II). The amended provision thus explicitly instructed upwind States to reduce emissions to account for pollution exported beyond their borders. As then written, however, the provision regulated only individual sources that, considered alone, emitted enough pollution to cause nonattainment in a downwind State. Because it is often "impossible to say that any single source or group of sources is the one which actually prevents attainment" downwind, S. Rep. No. 101–228, p. 21 (1989), the 1977 version of the Good Neighbor Provision proved ineffective, see *ibid.* (noting the provision's inability to curb the collective "emissions [of] multiple sources").

Congress most recently amended the Good Neighbor Provision in 1990. The statute, in its current form, requires SIPs to "contain adequate provisions . . . prohibiting

——————

[2] FIPs and SIPs were introduced in the 1970 version of the Act; the particular deadlines discussed here were added in 1990. See 104 Stat. 2409, 2422–2423, 42 U. S. C. §§7401(a)(1), 7410(c) (2006 ed.).

. . . any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will . . . contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any . . . [NAAQS]." 42 U. S. C. §7410(a)(2)(D)(i) (2006 ed.). The controversy before us centers on EPA's most recent attempt to construe this provision.

C

Three times over the past two decades, EPA has attempted to delineate the Good Neighbor Provision's scope by identifying when upwind States "contribute significantly" to nonattainment downwind. In 1998, EPA issued a rule known as the "$NO_X$ SIP Call." That regulation limited $NO_X$ emissions in 23 upwind States to the extent such emissions contributed to nonattainment of ozone standards in downwind States. See 63 Fed. Reg. 57356, 57358. In *Michigan* v. *EPA*, 213 F. 3d 663 (2000), the D. C. Circuit upheld the $NO_X$ SIP Call, specifically affirming EPA's use of costs to determine when an upwind State's contribution was "significan[t]" within the meaning of the statute. *Id.,* at 674–679.

In 2005, EPA issued the Clean Air Interstate Rule, or CAIR. 70 Fed. Reg. 25162. CAIR regulated both $NO_X$ and $SO_2$ emissions, insofar as such emissions contributed to downwind nonattainment of two NAAQS, both set in 1997, one concerning the permissible annual measure of $PM_{2.5}$, and another capping the average ozone level gauged over an 8-hour period. See *id.,* at 25171. The D. C. Circuit initially vacated CAIR as arbitrary and capricious. See *North Carolina* v. *EPA*, 531 F. 3d 896, 921 (2008) (*per curiam*). On rehearing, the court decided to leave the rule in place, while encouraging EPA to act with dispatch in dealing with problems the court had identified. See *North Carolina* v. *EPA*, 550 F. 3d 1176, 1178 (2008) (*per curiam*).

The rule challenged here—the Transport Rule—is EPA's

response to the D. C. Circuit's *North Carolina* decision. Finalized in August 2011, the Transport Rule curtails $NO_X$ and $SO_2$ emissions of 27 upwind States to achieve downwind attainment of three different NAAQS: the two 1997 NAAQS previously addressed by CAIR, and the 2006 NAAQS for $PM_{2.5}$ levels measured on a daily basis. See 76 Fed. Reg. 48208–48209.

Under the Transport Rule, EPA employed a "two-step approach" to determine when upwind States "contribute[d] significantly to nonattainment," *id.,* at 48254, and therefore in "amounts" that had to be eliminated. At step one, called the "screening" analysis, the Agency excluded as *de minimis* any upwind State that contributed less than one percent of the three NAAQS[3] to any downwind State "receptor," a location at which EPA measures air quality. See *id.,* at 48236–48237.[4] If all of an upwind State's contributions fell below the one-percent threshold, that State would be considered not to have "contribute[d] significantly" to the nonattainment of any downwind State. *Id.,* at 48236. States in that category were screened out and exempted from regulation under the rule.

The remaining States were subjected to a second inquiry, which EPA called the "control" analysis. At this stage, the Agency sought to generate a cost-effective allocation of emission reductions among those upwind States "screened in" at step one.

The control analysis proceeded this way. EPA first calculated, for each upwind State, the quantity of emissions the State could eliminate at each of several cost

––––––––––––

[3] With respect to each NAAQS addressed by the rule, the one-percent threshold corresponded to levels of 0.15 micrograms per cubic meter ($\mu g/m^3$) for annual $PM_{2.5}$, 0.35 $\mu g/m^3$ for daily $PM_{2.5}$, and 0.8 parts per billion (ppb) for 8-hour ozone. See 76 Fed. Reg. 48236–48237.

[4] If, for example, the NAAQS for ozone were 100 ppb, a contribution of less than 1 ppb to any downwind location would fall outside EPA's criteria for significance.

thresholds. See *id.,* at 48248–48249. Cost for these pur-
poses is measured as cost per ton of emissions prevented,
for instance, by installing scrubbers on powerplant smoke-
stacks.[5] EPA estimated, for example, the amount each
upwind State's $NO_X$ emissions would fall if all pollution
sources within each State employed every control measure
available at a cost of $500 per ton or less. See *id.,* at
48249–48251. The Agency then repeated that analysis at
ascending cost thresholds. See *ibid.*[6]

Armed with this information, EPA conducted complex
modeling to establish the combined effect the upwind
reductions projected at each cost threshold would have on
air quality in downwind States. See *id.,* at 48249. The
Agency then identified "significant cost threshold[s],"
points in its model where a "noticeable change occurred in
downwind air quality, such as . . . where large upwind
emission reductions become available because a certain
type of emissions control strategy becomes cost-effective."
*Ibid.* For example, reductions of $NO_X$ sufficient to resolve
or significantly curb downwind air quality problems could
be achieved, EPA determined, at a cost threshold of $500
per ton (applied uniformly to all regulated upwind States).
"Moving beyond the $500 cost threshold," EPA concluded,
"would result in only minimal additional . . . reductions [in
emissions]." *Id.,* at 48256.[7]

Finally, EPA translated the cost thresholds it had se-

————————

[5] To illustrate, a technology priced at $5,000 and capable of eliminat-
ing two tons of pollution would be stated to "cost" $2,500 per ton.

[6] For $SO_2$, EPA modeled reductions that would be achieved at cost
levels of $500, $1,600, $2,300, $2,800, $3,300, and $10,000 per ton
eliminated. See *id.*, at 48251–48253.

[7] For $SO_2$, EPA determined that, for one group of upwind States, all
downwind air quality problems would be resolved at the $500 per ton
threshold. See *id.*, at 48257. For another group of States, however,
this level of controls would not suffice. For those States, EPA found
that pollution controls costing $2,300 per ton were necessary. See *id.,*
at 48259.

lected into amounts of emissions upwind States would be required to eliminate. For each regulated upwind State, EPA created an annual emissions "budget." These budgets represented the quantity of pollution an upwind State would produce in a given year if its in-state sources implemented all pollution controls available at the chosen cost thresholds. See *id.,* at 48249.[8] If EPA's projected improvements to downwind air quality were to be realized, an upwind State's emissions could not exceed the level this budget allocated to it, subject to certain adjustments not relevant here.

Taken together, the screening and control inquiries defined EPA's understanding of which upwind emissions were within the Good Neighbor Provision's ambit. In short, under the Transport Rule, an upwind State "contribute[d] significantly" to downwind nonattainment to the extent its exported pollution both (1) produced one percent or more of a NAAQS in at least one downwind State (step one) and (2) could be eliminated cost-effectively, as determined by EPA (step two). See *id.,* at 48254. Upwind States would be obliged to eliminate all and only emissions meeting both of these criteria.[9]

For each State regulated by the Transport Rule, EPA contemporaneously promulgated a FIP allocating that State's emission budget among its in-state sources. See *id.,* at 48271, 48284–48287.[10] For each of these States,

––––––––

[8] In 2014, for example, pollution sources within Texas would be permitted to emit no more than 243,954 tons of $SO_2$, subject to variations specified by EPA. See *id.*, at 48269 (Table VI.F–1).

[9] Similarly, upwind States EPA independently determined to be "interfer[ing] with [the] maintenance" of NAAQS downwind were required to eliminate pollution only to the extent their emissions satisfied both of these criteria. See *id.,* at 48254.

[10] These FIPs specified the maximum amount of pollution each in-state pollution source could emit. Sources below this ceiling could sell unused "allocations" to sources that could not reduce emissions to the necessary level as cheaply. See *id.*, at 48271–48272. This type of "cap-

EPA had determined that the State had failed to submit a SIP adequate for compliance with the Good Neighbor Provision. These determinations regarding SIPs became final after 60 days, see 42 U. S. C. §7607(b)(1)(2006 ed., Supp. V), and many went unchallenged.[11] EPA views the SIP determinations as having triggered its statutory obligation to promulgate a FIP within two years, see §7410(c), a view contested by respondents, see Part II, *infra.*

D

A group of state and local governments (State respondents), joined by industry and labor groups (Industry respondents), petitioned for review of the Transport Rule in the U. S. Court of Appeals for the D. C. Circuit. Over the dissent of Judge Rogers, the Court of Appeals vacated the rule in its entirety. See 696 F. 3d 7, 37 (2012).

EPA's actions, the appeals court held, exceeded the Agency's statutory authority in two respects. By promulgating FIPs before giving States a meaningful opportunity to adopt their own implementation plans, EPA had, in the court's view, upset the CAA's division of responsibility between the States and the Federal Government. In the main, the Court of Appeals acknowledged, EPA's FIP authority is triggered at the moment the Agency disapproves a SIP. See *id.,* at 30. Thus, when a State proposes

_____

and-trade" system cuts costs while still reducing pollution to target levels.

[11] Three States did challenge EPA's determinations. See Petition for Review in *Ohio* v. *EPA*, No. 11–3988 (CA6); Petition for Review in *Kansas* v. *EPA*, No. 12–1019 (CADC); Notice in *Georgia* v. *EPA*, No. 11–1427 (CADC). Those challenges were not consolidated with this proceeding, and they remain pending (held in abeyance for these cases) in the Sixth and D. C. Circuits. See Twelfth Joint Status Report in *Ohio* v. *EPA*, No. 11–3988 (CA6); Order in *Kansas* v. *EPA*, No. 11–1333 (CADC, May 10, 2013); Order in *Georgia* v. *EPA*, No. 11–1427 (CADC, May 10, 2013).

a SIP inadequate to achieve a NAAQS, EPA could promulgate a FIP immediately after disapproving that SIP. See *id.,* at 32.

But the Court of Appeals ruled that a different regime applies to a State's failure to meet its obligations under the Good Neighbor Provision. While a NAAQS was a "clear numerical target," a State's good neighbor obligation remained "nebulous and unknown," the court observed, until EPA calculated the State's emission budget. *Ibid.* Without these budgets, the Court of Appeals said, upwind States would be compelled to take a "stab in the dark" at calculating their own significant contribution to interstate air pollution. *Id.,* at 35. The D. C. Circuit read the Act to avoid putting States in this position: EPA had an implicit statutory duty, the court held, to give upwind States a reasonable opportunity to allocate their emission budgets among in-state sources before the Agency's authority to issue FIPs could be triggered. *Id.,* at 37.

The D. C. Circuit also held that the Agency's two-part interpretation of the Good Neighbor Provision ignored three "red lines . . . cabin[ing the] EPA's authority." *Id.,* at 19. First, the D. C. Circuit interpreted the Good Neighbor Provision to require upwind States to reduce emissions in "a manner proportional to their contributio[n]" to pollution in downwind States. *Id.,* at 21. The Transport Rule, however, treated all regulated upwind States alike, regardless of their relative contribution to the overall problem. See *id.,* at 23. It required all upwind States "screened in" at step one to reduce emissions in accord with the uniform cost thresholds set during the step two control analysis. Imposing these uniform cost thresholds, the Court of Appeals observed, could force some upwind States to reduce emissions by more than their "fair share." *Id.,* at 27.

According to the Court of Appeals, EPA had also failed to ensure that the Transport Rule did not mandate up-

wind States to reduce pollution unnecessarily.  The Good Neighbor Provision, the D. C. Circuit noted, "targets [only] those emissions from upwind States that 'contribute significantly *to nonattainment'*" of a NAAQS in downwind States.  *Id.,* at 22.  Pollution reduction beyond that goal was "unnecessary over-control," outside the purview of the Agency's statutory mandate.  *Ibid.*  Because the emission budgets were calculated by reference to cost alone, the court concluded that EPA had done nothing to guard against, or even measure, the "over-control" potentially imposed by the Transport Rule.  See *ibid.*

Finally, by deciding, at the screening analysis, that upwind contributions below the one-percent threshold were insignificant, EPA had established a "floor" on the Agency's authority to act.  See *id.,* at 20, and n. 13.  Again pointing to the rule's reliance on costs, the Court of Appeals held that EPA had failed to ensure that upwind States were not being forced to reduce emissions below the one-percent threshold.  See *ibid.*

In dissent, Judge Rogers criticized the majority for deciding two questions that were not, in her view, properly before the court.  See *id.,* at 40–46, 51–58.  First, she addressed the majority's insistence that FIPs abide a State's opportunity to allocate its emission budget among in-state sources.  She regarded the respondents' plea to that effect as an untimely attack on EPA's previous SIP disapprovals.  See *id.,* at 40–46.  Second, in Judge Rogers' assessment, the respondents had failed to raise their substantive objections to the Transport Rule with the specificity necessary to preserve them for review.  See *id.,* at 51–58.  On the merits, Judge Rogers found nothing in the Act to require, or even suggest, that EPA must quantify a State's good neighbor obligations before it promulgated a FIP.  See *id.,* at 46–51.  She also disagreed with the court's conclusion that the Transport Rule unreasonably interpreted the Act.  See *id.,* at 58–60.

We granted certiorari to decide whether the D. C. Circuit had accurately construed the limits the CAA places on EPA's authority. See 570 U. S. ___ (2013).

## II

## A

Once EPA has calculated emission budgets, the D. C. Circuit held, the Agency must give upwind States the opportunity to propose SIPs allocating those budgets among in-state sources before issuing a FIP. 696 F. 3d, at 37. As the State respondents put it, a FIP allocating a State's emission budget "must issue *after* EPA has quantified the States' good-neighbor obligations [in an emission budget] and given the States a reasonable opportunity to meet those obligations in SIPs." Brief for State Respondents 20.

Before reaching the merits of this argument, we first reject EPA's threshold objection that the claim is untimely. According to the Agency, this argument—and the D. C. Circuit's opinion accepting it—rank as improper collateral attacks on EPA's prior SIP disapprovals. As earlier recounted, see *supra,* at 9–10, EPA, by the time it issued the Transport Rule, had determined that each regulated upwind State had failed to submit a SIP adequate to satisfy the Good Neighbor Provision. Many of those determinations, because unchallenged, became final after 60 days, see 42 U. S. C. §7607(b)(1), and did so before the petitions here at issue were filed. EPA argues that the Court cannot question exercise of the Agency's FIP authority without subjecting these final SIP disapprovals to untimely review.

We disagree. The gravamen of the State respondents' challenge is not that EPA's disapproval of any particular SIP was erroneous. Rather, respondents urge that, notwithstanding these disapprovals, the Agency was obliged to grant an upwind State a second opportunity to promul-

gate adequate SIPs once EPA set the State's emission budget. This claim does not depend on the validity of the prior SIP disapprovals. Even assuming the legitimacy of those disapprovals, the question remains whether EPA was required to do more than disapprove a SIP, as the State respondents urge, to trigger the Agency's statutory authority to issue a FIP.[12]

B

Turning to the merits, we hold that the text of the statute supports EPA's position. As earlier noted, see *supra*, at 4–5, the CAA sets a series of precise deadlines to which the States and EPA must adhere. Once EPA issues any new or revised NAAQS, a State has three years to adopt a SIP adequate for compliance with the Act's requirements. See 42 U. S. C. §7410(a)(1). Among those requirements is the Act's mandate that SIPs "shall" include provisions sufficient to satisfy the Good Neighbor Provision. §7410(a)(2).

If EPA determines a SIP to be inadequate, the Agency's mandate to replace it with a FIP is no less absolute:

> "[EPA] shall promulgate a [FIP] at any time within 2 years after the [Agency]
>
> "(A) finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the minimum [relevant] criteria . . . , or

---

[12] The State respondents make a second argument we do not reach. They urge that EPA could not impose FIPs on several upwind States whose SIPs had been previously approved by the Agency under CAIR. EPA changed those approvals to disapprovals when it issued the Transport Rule, see 76 Fed. Reg. 48220, and the States assert that the process by which EPA did so was improper. That argument was not passed on by the D. C. Circuit, see 696 F. 3d 7, 31, n. 29 (2012), and we leave it for the Court of Appeals to consider in the first instance on remand.

"(B) disapproves a [SIP] in whole or in part,

"unless the State corrects the deficiency, and [EPA] approves the plan or plan revision, before the [Agency] promulgates such [FIP]." §7410(c)(1).

In other words, once EPA has found a SIP inadequate, the Agency has a statutory duty to issue a FIP "at any time" within two years (unless the State first "corrects the deficiency," which no one contends occurred here).

The D. C. Circuit, however, found an unwritten exception to this strict time prescription for SIPs aimed at implementing the Good Neighbor Provision. Expecting any one State to develop a "comprehensive solution" to the "collective problem" of interstate air pollution without first receiving EPA's guidance was, in the Court of Appeals' assessment, "set[ting] the States up to fail." 696 F. 3d, at 36–37. The D. C. Circuit therefore required EPA, after promulgating each State's emission budget, to give the State a "reasonable" period of time to propose SIPs implementing its budget. See *id.,* at 37.

However sensible (or not) the Court of Appeals' position,[13] a reviewing court's "task is to apply the text [of the statute], not to improve upon it." *Pavelic & LeFlore* v. *Marvel Entertainment Group, Div. of Cadence Industries Corp.,* 493 U. S. 120, 126 (1989). Nothing in the Act dif-

——————

[13] On this point, the dissent argues that it is "beyond responsible debate that the States cannot possibly design FIP-proof SIPs without knowing the EPA-prescribed targets at which they must aim." *Post,* at 18. Many of the State respondents thought otherwise, however, when litigating the matter in *Michigan* v. *EPA,* 213 F. 3d 663 (CADC 2000). See Final Brief for Petitioning States in No. 98–1497 (CADC), p. 34 ("EPA has the responsibility to establish NAAQS," but without further intervention by EPA, "States [have] the duty and right to develop . . . SIPs . . . to meet those NAAQS."). See also *id.,* at 37 ("EPA's role is to determine whether the SIP submitted is 'adequate' . . . not to dictate contents of the submittal in the first instance. . . . [E]ach State has the right and the obligation to write a SIP that complies with §[74]10(a)(2), including the 'good neighbor' provision.").

ferentiates the Good Neighbor Provision from the several other matters a State must address in its SIP. Rather, the statute speaks without reservation: Once a NAAQS has been issued, a State "shall" propose a SIP within three years, §7410(a)(1), and that SIP "shall" include, among other components, provisions adequate to satisfy the Good Neighbor Provision, §7410(a)(2).

Nor does the Act condition the duty to promulgate a FIP on EPA's having first quantified an upwind State's good neighbor obligations. As Judge Rogers observed in her dissent from the D. C. Circuit's decision, the Act does not require EPA to furnish upwind States with information of any kind about their good neighbor obligations before a FIP issues. See 696 F. 3d, at 47. Instead, a SIP's failure to satisfy the Good Neighbor Provision, without more, triggers EPA's obligation to issue a federal plan within two years. §7410(c). After EPA has disapproved a SIP, the Agency can wait up to two years to issue a FIP, during which time the State can "correc[t] the deficiency" on its own. *Ibid.* But EPA is not obliged to wait two years or postpone its action even a single day: The Act empowers the Agency to promulgate a FIP "at any time" within the two-year limit. *Ibid.* Carving out an exception to the Act's precise deadlines, as the D. C. Circuit did, "rewrites a decades-old statute whose plain text and structure establish a clear chronology of federal and State responsibilities." 696 F. 3d, at 47 (Rogers, J., dissenting).

The practical difficulties cited by the Court of Appeals do not justify departure from the Act's plain text. See *Barnhart* v. *Sigmon Coal Co.*, 534 U. S. 438, 461–462 (2002) (We "must presume that a legislature says in a statute what it means and means in a statute what it says there." (internal quotation marks omitted)). When Congress elected to make EPA's input a prerequisite to state action under the Act, it did so expressly. States developing vehicle inspection and maintenance programs under

the CAA, for example, must await EPA guidance before issuing SIPs. 42 U. S. C. §7511a(c)(3)(B). A State's obligation to adopt a SIP, moreover, arises only after EPA has first set the NAAQS the State must meet. §7410(a)(1). Had Congress intended similarly to defer States' discharge of their obligations under the Good Neighbor Provision, Congress, we take it, would have included a similar direction in that section. See *Jama* v. *Immigration and Customs Enforcement*, 543 U. S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

In short, nothing in the statute places EPA under an obligation to provide specific metrics to States before they undertake to fulfill their good neighbor obligations. By altering the schedule Congress provided for SIPs and FIPs, the D. C. Circuit stretched out the process. It allowed a delay Congress did not order and placed an information submission obligation on EPA Congress did not impose. The D. C. Circuit, we hold, had no warrant thus to revise the CAA's action-ordering prescriptions.

C

At oral argument, the State respondents emphasized EPA's previous decisions, in the NOx SIP Call and CAIR, to quantify the emission reductions required of upwind States before the window to propose a SIP closed. See Tr. of Oral Arg. 37–39, 42–43, 45–46. In their view, by failing to accord States a similar grace period after issuing States' emission budgets, EPA acted arbitrarily. See *ibid.*

Whatever pattern the Agency followed in its NOx SIP call and CAIR proceedings, EPA retained discretion to alter its course provided it gave a reasonable explanation for doing so. *Motor Vehicle Mfrs. Assn. of United States,*

*Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 42 (1983). The Agency presented such an explanation in the Transport Rule. As noted, see *supra,* at 6, the D. C. Circuit's *North Carolina* decision admonished EPA to act with dispatch in amending or replacing CAIR, the Transport Rule's predecessor. See 550 F. 3d, at 1178 (warning EPA that the stay of the court's decision to vacate CAIR would not persist "indefinite[ly]"). Given *North Carolina*'s stress on expeditious action to cure the infirmities the court identified in CAIR, EPA thought it "[in]appropriate to establish [the] lengthy transition period" entailed in allowing States time to propose new or amended SIPs implementing the Transport Rule emission budgets. See 76 Fed. Reg. 48220 (citing *North Carolina*, 550 F. 3d 1176). Endeavoring to satisfy the D. C. Circuit's directive, EPA acted speedily, issuing FIPs contemporaneously with the Transport Rule. In light of the firm deadlines imposed by the Act, which we hold the D. C. Circuit lacked authority to alter, we cannot condemn EPA's decision as arbitrary or capricious.[14]

### III
### A

The D. C. Circuit also held that the Transport Rule's two-step interpretation of the Good Neighbor Provision conflicts with the Act. Before addressing this holding, we take up a jurisdictional objection raised by EPA.

The CAA directs that "[o]nly an objection to a rule . . .

---

[14] In light of the CAA's "core principle" of cooperative federalism, the dissent believes EPA abused its discretion by failing to give States an additional opportunity to submit SIPs in satisfaction of the Good Neighbor Provision. *Post*, at 19. But nothing in the statute so restricts EPA. To the contrary, as earlier observed, see *supra*, at 16, the plain text of the CAA grants EPA plenary authority to issue a FIP "at *any* time" within the two-year period that begins the moment EPA determines a SIP to be inadequate. §7410(c)(1) (emphasis added).

raised with reasonable specificity during the period for public comment . . . may be raised during judicial review." 42 U. S. C. §7607(d)(7)(B). Respondents failed to state their objections to the Transport Rule during the comment period with the "specificity" required for preservation, EPA argues. See Brief for Federal Petitioners 34–42. This failure at the administrative level, EPA urges, forecloses judicial review. *Id.,* at 34.

Assuming, without deciding, that respondents did not meet the Act's "reasonable specificity" requirement during the comment period, we do not regard that lapse as "jurisdictional." This Court has cautioned against "profligate use" of the label "jurisdictional." *Sebelius* v. *Auburn Regional Medical Center*, 568 U. S. \_\_\_, \_\_\_ (2013) (slip op., at 6). A rule may be "mandatory," yet not "jurisdictional," we have explained. See *Arbaugh* v. *Y & H Corp.*, 546 U. S. 500, 510 (2006). Section 7607(d)(7)(B), we hold, is of that character. It does not speak to a court's authority, but only to a party's procedural obligations. See *Kontrick* v. *Ryan*, 540 U. S. 443, 455 (2004). Had EPA pursued the "reasonable specificity" argument vigorously before the D. C. Circuit, we would be obligated to address the merits of the argument. See *Gonzalez* v. *Thaler*, 565 U. S. \_\_\_, \_\_\_ (2012) (slip op., at 10). But EPA did not press the argument unequivocally. Before the D. C. Circuit, it indicated only that the "reasonable specificity" prescription might bar judicial review. Brief for Respondent EPA et al. in No. 11–1302 (CADC), p. 30. See also *id.,* at 32. We therefore do not count the prescription an impassable hindrance to our adjudication of the respondents' attack on EPA's interpretation of the Transport Rule. We turn to that attack mindful of the importance of the issues respondents raise to the ongoing implementation of the Good Neighbor Provision.

### B

We routinely accord dispositive effect to an agency's reasonable interpretation of ambiguous statutory language. *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), is the pathmarking decision, and it bears a notable resemblance to the cases before us. *Chevron* concerned EPA's definition of the term "source," as used in the 1977 Amendments to the CAA. *Id.,* at 840, n. 1. Those amendments placed additional restrictions on companies' liberty to add new pollution "sources" to their factories. See *id.,* at 840. Although "source" might have been interpreted to refer to an individual smokestack, EPA construed the term to refer to an entire plant, thereby "treat[ing] all of the pollution-emitting devices within the [plant] as though they were encased within a single 'bubble.'" *Ibid.* Under the Agency's interpretation, a new pollution-emitting device would not subject a plant to the additional restrictions if the "alteration [did] not increase the total emissions [produced by] the plant." *Ibid.*

This Court held EPA's interpretation of "source" a reasonable construction of an ambiguous statutory term. When "Congress has not directly addressed the precise [interpretative] question at issue," we cautioned, a reviewing court cannot "simply impose its own construction o[f] the statute." *Id.,* at 843. Rather, the agency is charged with filling the "gap left open" by the ambiguity. *Id.,* at 866. Because "'a full understanding of the force of the statutory policy . . . depend[s] upon more than ordinary knowledge'" of the situation, the administering agency's construction is to be accorded "controlling weight unless . . . arbitrary, capricious, or manifestly contrary to the statute." *Id.,* at 844 (quoting *United States* v. *Shimer*, 367 U. S. 374, 382 (1961)). Determining that none of those terms fit EPA's interpretation of "source," the Court deferred to the Agency's judgment.

We conclude that the Good Neighbor Provision delegates authority to EPA at least as certainly as the CAA provisions involved in *Chevron*. The statute requires States to eliminate those "amounts" of pollution that "contribute significantly to *nonattainment*" in downwind States. 42 U. S. C. §7410(a)(2)(D)(i) (emphasis added). Thus, EPA's task[15] is to reduce upwind pollution, but only in "amounts" that push a downwind State's pollution concentrations above the relevant NAAQS. As noted earlier, however, the nonattainment of downwind States results from the collective and interwoven contributions of multiple upwind States. See *supra,* at 3. The statute therefore calls upon the Agency to address a thorny causation problem: How should EPA allocate among multiple contributing upwind States responsibility for a downwind State's excess pollution?

A simplified example illustrates the puzzle EPA faced. Suppose the Agency sets a NAAQS, with respect to a particular pollutant, at 100 parts per billion (ppb), and that the level of the pollutant in the atmosphere of downwind State A is 130 ppb. Suppose further that EPA has determined that each of three upwind States—X, Y, and Z—contributes the equivalent of 30 ppb of the relevant pollutant to State A's airspace. The Good Neighbor Provision, as just observed, prohibits only upwind emissions that contribute significantly to downwind *nonattainment*. EPA's authority under the provision is therefore limited to eliminating a *total* of 30 ppb,[16] *i.e.,* the overage caused by

—————

[15] Though we speak here of "EPA's task," the Good Neighbor Provision is initially directed to upwind States. As earlier explained, see Part II–B, *supra*, only after a State has failed to propose a SIP adequate for compliance with the provision is EPA called upon to act.

[16] Because of the uncertainties inherent in measuring interstate air pollution, see *supra,* at 3–4, reductions of *exactly* 30 ppb likely are unattainable. See *infra*, at 30–31.

the collective contribution of States X, Y, and Z.[17]

How is EPA to divide responsibility among the three States? Should the Agency allocate reductions proportionally (10 ppb each), on a per capita basis, on the basis of the cost of abatement, or by some other metric? See Brief for Federal Petitioners 50 (noting EPA's consideration of different approaches). The Good Neighbor Provision does not answer that question for EPA. Cf. *Chevron*, 467 U. S., at 860 ("[T]he language of [the CAA] simply does not compel any given interpretation of the term 'source.'"). Under *Chevron*, we read Congress' silence as a delegation of authority to EPA to select from among reasonable options. See *United States* v. *Mead Corp.*, 533 U. S. 218, 229 (2001).[18]

Yet the Court of Appeals believed that the Act speaks clearly, requiring EPA to allocate responsibility for reducing emissions in "a manner proportional to" each State's "contributio[n]" to the problem. 696 F. 3d, at 21. Nothing

——————
[17] For simplicity's sake, the hypothetical assumes that EPA has not required any emission reductions by the downwind State itself.

[18] The statutory gap identified also exists in the Good Neighbor Provision's second instruction. That instruction requires EPA to eliminate amounts of upwind pollution that "interfere with maintenance" of a NAAQS by a downwind State. §7410(a)(2)(D)(i). This mandate contains no qualifier analogous to "significantly," and yet it entails a delegation of administrative authority of the same character as the one discussed above. Just as EPA is constrained, under the first part of the Good Neighbor Provision, to eliminate only those amounts that "contribute . . . to *nonattainment*," EPA is limited, by the second part of the provision, to reduce only by "amounts" that "interfere with *maintenance*," *i.e.,* by just enough to permit an already-attaining State to maintain satisfactory air quality. (Emphasis added.) With multiple upwind States contributing to the maintenance problem, however, EPA confronts the same challenge that the "contribute significantly" mandate creates: How should EPA allocate reductions among multiple upwind States, many of which contribute in amounts sufficient to impede downwind maintenance? Nothing in *either* clause of the Good Neighbor Provision provides the criteria by which EPA is meant to apportion responsibility.

in the text of the Good Neighbor Provision propels EPA down this path. Understandably so, for as EPA notes, the D. C. Circuit's proportionality approach could scarcely be satisfied in practice. See App. in No. 11–1302 etc. (CADC), p. 2312 ("[W]hile it is possible to determine an emission reduction percentage if there is a single downwind [receptor], most upwind states contribute to multiple downwind [receptors] (in multiple states) and would have a different reduction percentage for each one.").

To illustrate, consider a variation on the example set out above. Imagine that States X and Y now contribute air pollution to State A in a ratio of one to five, *i.e.,* State Y contributes five times the amount of pollution to State A than does State X. If State A were the only downwind State to which the two upwind States contributed, the D. C. Circuit's proportionality requirement would be easy to meet: EPA could require State Y to reduce its emissions by five times the amount demanded of State X.

The realities of interstate air pollution, however, are not so simple. Most upwind States contribute pollution to multiple downwind States in varying amounts. See 76 Fed. Reg. 48239–48246. See also Brief for Respondent Calpine Corp. et al. in Support of Petitioners 48–49 (offering examples). Suppose then that States X and Y also contribute pollutants to a second downwind State (State B), this time in a ratio of seven to one. Though State Y contributed a relatively larger share of pollution to State A, with respect to State B, State X is the greater offender. Following the proportionality approach with respect to State B would demand that State X reduce its emissions by seven times as much as State Y. Recall, however, that State Y, as just hypothesized, had to effect five times as large a reduction with respect to State A. The Court of Appeals' proportionality edict with respect to *both* State A and State B appears to work neither mathematically nor in practical application. Proportionality as to one down-

wind State will not achieve proportionality as to others. Quite the opposite. And where, as is generally true, upwind States contribute pollution to more than two downwind receptors, proportionality becomes all the more elusive.

Neither the D. C. Circuit nor respondents face up to this problem. The dissent, for its part, strains to give meaning to the D. C. Circuit's proportionality constraint as applied to a world in which multiple upwind States contribute emissions to multiple downwind locations. In the dissent's view, upwind States must eliminate emissions by "whatever minimum amount reduces" their share of the overage in each and every one of the downwind States to which they are linked. See *post*, at 8. In practical terms, this means each upwind State will be required to reduce emissions by the amount necessary to eliminate that State's largest downwind contribution. The dissent's formulation, however, does not account for the combined and cumulative effect of each upwind State's reductions on attainment in multiple downwind locations. See *ibid.* ("Under a proportional-reduction approach, State X would be required to eliminate emissions of that pollutant by whatever minimum amount reduces *both* State A's level by 0.2 unit and State B's by 0.7 unit." (emphasis added)). The result would be costly overregulation unnecessary to, indeed in conflict with, the Good Neighbor Provision's goal of attainment.[19]

_____

[19] To see why, one need only slightly complicate the world envisioned by the dissent. Assume the world is made up of only four States—two upwind (States X and Y), and two downwind (States A and B). Suppose also, as the dissent allows, see *post*, at 9, that the reductions State X must make to eliminate its share of the amount by which State A is in nonattainment are more than necessary for State X to eliminate its share of State B's nonattainment. As later explained, see *infra*, at 29–30, this kind of "over-control," we agree with the dissent, is acceptable under the statute. Suppose, however, that State Y also contributes to pollution in both State A and State B such that the reductions it must

In response, the dissent asserts that EPA will "simply be required to make allowance for" the overregulation caused by its "proportional-reduction" approach. *Post*, at 11. What criterion should EPA employ to determine which States will have to make those "allowance[s]" and by how much? The dissent admits there are "multiple ways" EPA might answer those questions. *Ibid.* But proportionality cannot be one of those ways, for the proportional-reduction approach is what led to the over-regulation in the first place. And if a nonproportional approach can play a role in setting the final allocation of reduction obligations, then it is hardly apparent why EPA, free to depart from proportionality at the back end, cannot do so at the outset.

Persuaded that the Good Neighbor Provision does not dictate the particular allocation of emissions among contributing States advanced by the D. C. Circuit, we must next decide whether the allocation method chosen by EPA is a "permissible construction of the statute." *Chevron*, 467 U. S., at 843. As EPA interprets the statute, upwind emissions rank as "amounts [that] . . . contribute significantly to nonattainment" if they (1) constitute one percent

_____

make to eliminate its proportion of State B's overage exceed the reductions it must make to bring State A into attainment. In this case, the dissent would have State X reduce by just enough to eliminate its share of State A's nonattainment and more than enough to eliminate its share of State B's overage. The converse will be true as to State Y: Under the dissent's approach, State Y would have to reduce by the "minimum" necessary to eliminate its proportional share of State B's nonattainment and more than enough to eliminate its proportion of State A's overage. The result is that the total amount by which both States X and Y are required to reduce will exceed what is necessary for attainment *in all downwind States involved* (*i.e.,* in both State A and State B). Over-control thus unnecessary to achieving attainment in all involved States is impermissible under the Good Neighbor Provision. See *infra*, at 30, n. 23. The problem would worsen were the hypothetical altered to include more than two downwind States and two upwind States, the very real circumstances EPA must address.

or more of a relevant NAAQS in a nonattaining downwind State and (2) can be eliminated under the cost threshold set by the Agency. See 76 Fed. Reg. 48254. In other words, to identify which emissions were to be eliminated, EPA considered both the magnitude of upwind States' contributions and the cost associated with eliminating them.

The Industry respondents argue that, however EPA ultimately divides responsibility among upwind States, the final calculation cannot rely on costs. The Good Neighbor Provision, respondents and the dissent emphasize, "requires each State to prohibit only those '*amounts*' of air pollution emitted within the State that 'contribute significantly' to another State's nonattaintment." Brief for Industry Respondents 23 (emphasis added). See also *post*, at 6. The cost of preventing emissions, they urge, is wholly unrelated to the actual "amoun[t]" of air pollution an upwind State contributes. Brief for Industry Respondents 23. Because the Transport Rule considers costs, respondents argue, "States that contribute identical 'amounts' . . . may be deemed [by EPA] to have [made] substantially *different*" contributions. *Id.,* at 30.

But, as just explained, see *supra,* at 21–22, the Agency cannot avoid the task of choosing which among equal "amounts" to eliminate. The Agency has chosen, sensibly in our view, to reduce the amount easier, *i.e.,* less costly, to eradicate, and nothing in the text of the Good Neighbor Provision precludes that choice.

Using costs in the Transport Rule calculus, we agree with EPA, also makes good sense. Eliminating those amounts that can cost-effectively be reduced is an efficient and equitable solution to the allocation problem the Good Neighbor Provision requires the Agency to address. Efficient because EPA can achieve the levels of attainment, *i.e.,* of emission reductions, the proportional approach aims to achieve, but at a much lower overall cost. Equita-

ble because, by imposing uniform cost thresholds on regulated States, EPA's rule subjects to stricter regulation those States that have done relatively less in the past to control their pollution. Upwind States that have not yet implemented pollution controls of the same stringency as their neighbors will be stopped from free riding on their neighbors' efforts to reduce pollution. They will have to bring down their emissions by installing devices of the kind in which neighboring States have already invested.

Suppose, for example, that the industries of upwind State A have expended considerable resources installing modern pollution-control devices on their plants. Factories in upwind State B, by contrast, continue to run old, dirty plants. Yet, perhaps because State A is more populous and therefore generates a larger sum of pollution overall, the two States' emissions have equal effects on downwind attainment. If State A and State B are required to eliminate emissions proportionally (*i.e.,* equally*),* sources in State A will be compelled to spend far more per ton of reductions because they have already utilized lower cost pollution controls. State A's sources will also have to achieve greater reductions than would have been required had they not made the cost-effective reductions in the first place. State A, in other words, will be tolled for having done more to reduce pollution in the past.[20] EPA's cost-based allocation avoids these anomalies.

Obligated to require the elimination of only those "amounts" of pollutants that contribute to the nonattainment of NAAQS in downwind States, EPA must decide how to differentiate among the otherwise like contributions of multiple upwind States. EPA found decisive the

--------

[20] The dissent's approach is similarly infirm. It, too, would toll those upwind States that have already invested heavily in means to reduce the pollution their industries cause, while lightening the burden on States that have done relatively less to control pollution emanating from local enterprises.

difficulty of eliminating each "amount," *i.e.,* the cost incurred in doing so.   Lacking a dispositive statutory instruction to guide it, EPA's decision, we conclude, is a "reasonable" way of filling the "gap left open by Congress." *Chevron*, 467 U. S., at 866.[21]

### C

The D. C. Circuit stated two further objections to EPA's cost-based method of defining an upwind State's contribution.   Once a State was screened in at step one of EPA's analysis, its emission budget was calculated solely with reference to the uniform cost thresholds the Agency selected at step two.   The Transport Rule thus left open the possibility that a State might be compelled to reduce emissions beyond the point at which every affected downwind State is in attainment, a phenomenon the Court of Appeals termed "over-control."   696 F. 3d, at 22; see *supra*, at 12.   Second, EPA's focus on costs did not foreclose, as the D. C. Circuit accurately observed, the possibility that an upwind State would be required to reduce its emissions by so much that the State no longer contributed one per-

---

[21] The dissent, see *post,* at 12–13, relies heavily on our decision in *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457 (2001).   In *Whitman*, we held that the relevant text of the CAA "unambiguously bars" EPA from considering costs when determining a NAAQS. *Id.,* at 471.   Section 7409(b)(1) commands EPA to set NAAQS at levels "requisite to protect the public health" with "an adequate margin of safety."   This mandate, we observed in *Whitman*, was "absolute," and precluded any other consideration (*e.g.,* cost) in the NAAQS calculation. *Id.*, at 465 (internal quotation marks omitted).   Not so of the Good Neighbor Provision, which grants EPA discretion to eliminate "amounts [of pollution that] . . . contribute significantly to nonattainment" downwind.   On the particular "amounts" that should qualify for elimination, the statute is silent.   Unlike the provision at issue in *Whitman*, which provides express criteria by which EPA is to set NAAQS, the Good Neighbor Provision, as earlier explained, fails to provide *any* metric by which EPA can differentiate among the contributions of multiple upwind States.   See *supra,* at 21–22.

cent or more of a relevant NAAQS to any downwind State. This would place the State below the mark EPA had set, during the screening phase, as the initial threshold of "significan[ce]." See *id.,* at 20, and n. 13.

We agree with the Court of Appeals to this extent: EPA cannot require a State to reduce its output of pollution by more than is necessary to achieve attainment in every downwind State or at odds with the one-percent threshold the Agency has set. If EPA requires an upwind State to reduce emissions by more than the amount necessary to achieve attainment in *every* downwind State to which it is linked, the Agency will have overstepped its authority, under the Good Neighbor Provision, to eliminate those "amounts [that] contribute . . . to nonattainment." Nor can EPA demand reductions that would drive an upwind State's contribution to every downwind State to which it is linked below one percent of the relevant NAAQS. Doing so would be counter to step one of the Agency's interpretation of the Good Neighbor Provision. See 76 Fed. Reg. 48236 ("[S]tates whose contributions are below th[e] thresholds do not significantly contribute to nonattainment . . . of the relevant NAAQS.").

Neither possibility, however, justifies wholesale invalidation of the Transport Rule. First, instances of "over-control" in particular downwind locations, the D. C. Circuit acknowledged, see 696 F. 3d, at 22, may be incidental to reductions necessary to ensure attainment elsewhere. Because individual upwind States often "contribute significantly" to nonattainment in multiple downwind locations, the emissions reduction required to bring one linked downwind State into attainment may well be large enough to push other linked downwind States over the attainment line.[22] As the Good Neighbor Provision seeks attainment

_____

[22] The following example, based on the record, is offered in Brief for Respondent Calpine Corp. et al. in Support of Petitioners 52–54. Ohio,

in *every* downwind State, however, exceeding attainment in one State cannot rank as "over-control" unless unnecessary to achieving attainment in *any* downwind State. Only reductions unnecessary to downwind attainment *anywhere* fall outside the Agency's statutory authority.[23]

Second, while EPA has a statutory duty to avoid over-control, the Agency also has a statutory obligation to avoid "under-control," *i.e.,* to maximize achievement of attainment downwind. For reasons earlier explained, see *supra,* at 3–4, a degree of imprecision is inevitable in tackling the problem of interstate air pollution. Slight changes in wind patterns or energy consumption, for example, may vary downwind air quality in ways EPA might not have anticipated. The Good Neighbor Provision requires EPA to seek

––––––––––

West Virginia, Pennsylvania, and Indiana each contribute in varying amounts to five different nonattainment areas in three downwind States. *Id.,* at 52. Implementation of the Transport Rule, EPA modeling demonstrates, will bring three of these five areas into attainment by a comfortable margin, and a fourth only barely. See *id.,* at 53, fig. 2. The fifth downwind receptor, however, will still fall short of attainment despite the reductions the rule requires. See *ibid.* But if EPA were to lower the emission reductions required of the upwind States to reduce over-attainment in the first three areas, the area barely achieving attainment would no longer do so, and the area still in nonattainment would fall even further behind. Thus, "over-control" of the first three downwind receptors is essential to the attainment achieved by the fourth and to the fifth's progress toward that goal.

[23] The dissent suggests that our qualification of the term "over-control" is tantamount to an admission that "nothing stands in the way of [a] proportional-reduction approach." *Post,* at 9. Not so. Permitting "over-control" as to one State for the purpose of achieving attainment in another furthers the stated goal of the Good Neighbor Provision, *i.e.,* attainment of NAAQS. By contrast, a proportional-reduction scheme is neither necessary to achieve downwind attainment, nor mandated by the terms of the statute, as earlier discussed, see *supra,* at 21–25. Permitting "over-control" for the purpose of achieving proportionality would thus contravene the clear limits the statute places on EPA's good neighbor authority, *i.e.,* to eliminate only those "amounts" of upwind pollutants essential to achieving attainment downwind.

downwind attainment of NAAQS notwithstanding the uncertainties. Hence, some amount of over-control, *i.e.,* emission budgets that turn out to be more demanding than necessary, would not be surprising. Required to balance the possibilities of under-control and over-control, EPA must have leeway in fulfilling its statutory mandate.

Finally, in a voluminous record, involving thousands of upwind-to-downwind linkages, respondents point to only a few instances of "unnecessary" emission reductions, and even those are contested by EPA. Compare Brief for Industry Respondents 19 with Reply Brief for Federal Petitioners 21–22. EPA, for its part, offers data, contested by respondents, purporting to show that few (if any) upwind States have been required to limit emissions below the one-percent threshold of significance. Compare Brief for Federal Petitioners 37, 54–55, with Brief for Industry Respondents 40.

If any upwind State concludes it has been forced to regulate emissions below the one-percent threshold or beyond the point necessary to bring all downwind States into attainment, that State may bring a particularized, as-applied challenge to the Transport Rule, along with any other as-applied challenges it may have. Cf. *Babbitt* v. *Sweet Home Chapter, Communities for Great Ore.,* 515 U. S. 687, 699–700 (1995) (approving agency's reasonable interpretation of statute despite possibility of improper applications); *American Hospital Assn.* v. *NLRB*, 499 U. S. 606, 619 (1991) (rejecting facial challenge to National Labor Relations Board rule despite possible arbitrary applications). Satisfied that EPA's cost-based methodology, on its face, is not "arbitrary, capricious, or manifestly contrary to the statute," *Chevron*, 467 U. S., at 844, we uphold the Transport Rule. The possibility that the rule, in uncommon particular applications, might exceed EPA's statutory authority does not warrant judicial condemnation of the rule in its entirety.

Opinion of the Court

In sum, we hold that the CAA does not command that States be given a second opportunity to file a SIP after EPA has quantified the State's interstate pollution obligations. We further conclude that the Good Neighbor Provision does not require EPA to disregard costs and consider exclusively each upwind State's physically proportionate responsibility for each downwind air quality problem. EPA's cost-effective allocation of emission reductions among upwind States, we hold, is a permissible, workable, and equitable interpretation of the Good Neighbor Provision.

\*  \*  \*

For the reasons stated, the judgment of the United States Court of Appeals for the D. C. Circuit is reversed, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE ALITO took no part in the consideration or decision of these cases.

# SUPREME COURT OF THE UNITED STATES

—————

Nos. 12–1182 and 12–1183

—————

### ENVIRONMENTAL PROTECTION AGENCY ET AL., PETITIONERS
12–1182                 *v.*
EME HOMER CITY GENERATION, L. P., ET AL.; AND

### AMERICAN LUNG ASSOCIATION ET AL., PETITIONERS
12–1183                 *v.*
EME HOMER CITY GENERATION, L. P., ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[April 29, 2014]

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, dissenting.

Too many important decisions of the Federal Government are made nowadays by unelected agency officials exercising broad lawmaking authority, rather than by the people's representatives in Congress. With the statute involved in the present cases, however, Congress did it right. It specified quite precisely the responsibility of an upwind State under the Good Neighbor Provision: to eliminate those *amounts of pollutants* that it contributes to downwind problem areas. But the Environmental Protection Agency was unsatisfied with this system. Agency personnel, perhaps correctly, thought it more efficient to require reductions not in proportion to the *amounts of pollutants* for which each upwind State is responsible, but on the basis of how *cost-effectively* each can decrease emissions.

SCALIA, J., dissenting

Today, the majority approves that undemocratic revision of the Clean Air Act.  The Agency came forward with a textual justification for its action, relying on a farfetched meaning of the word "significantly" in the statutory text.  That justification is so feeble that today's majority does not even recite it, much less defend it.  The majority reaches its result ("Look Ma, no hands!") without benefit of text, claiming to have identified a remarkable "gap" in the statute, which it proceeds to fill (contrary to the plain logic of the statute) with cost-benefit analysis—and then, with no pretended textual justification at all, simply extends cost-benefit analysis beyond the scope of the alleged gap.

Additionally, the majority relieves EPA of any obligation to announce novel interpretations of the Good Neighbor Provision before the States must submit plans that are required to comply with those interpretations.  By according the States primacy in deciding how to attain the governing air-quality standards, the Clean Air Act is pregnant with an obligation for the Agency to set those standards before the States can be expected to achieve them.  The majority nonetheless approves EPA's promulgation of federal plans implementing good-neighbor benchmarks before the States could conceivably have met those benchmarks on their own.

I would affirm the judgment of the D. C. Circuit that EPA violated the law both in crafting the Transport Rule and in implementing it.[1]

## I. The Transport Rule

"It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."  *Bowen* v. *Georgetown Univ.*

---

[1] I agree with the majority's analysis turning aside EPA's threshold objections to judicial review.  See *ante*, at 13–14, 18–19.

*Hospital*, 488 U. S. 204, 208 (1988). Yet today the majority treats the text of the Clean Air Act not as the source and ceiling of EPA's authority to regulate interstate air pollution, but rather as a difficulty to be overcome in pursuit of the Agency's responsibility to "craf[t] a solution to the problem of interstate air pollution." *Ante*, at 3. In reality, Congress itself has crafted the solution. The Good Neighbor Provision requires each State to eliminate whatever "amounts" of "air pollutant[s]" "contribute significantly to nonattainment" or "interfere with maintenance" of national ambient air-quality standards (NAAQS) in other States. 42 U. S. C. §7410(a)(2)(D)(i)(I). The statute addresses solely the environmental consequences of emissions, *not* the facility of reducing them; and it requires States to shoulder burdens in proportion to the size of their contributions, *not* in proportion to the ease of bearing them. EPA's utterly fanciful "from each according to its ability" construction sacrifices democratically adopted text to bureaucratically favored policy. It deserves no deference under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984).

A. Alleged Textual Support: "Significantly"

In the Government's argument here, the asserted textual support for the efficient-reduction approach adopted by EPA in the Transport Rule is the ambiguity of the word "significantly" in the statutory requirement that each State eliminate those "amounts" of pollutants that "contribute *significantly* to nonattainment" in downwind States. §7410(a)(2)(D)(i)(I) (emphasis added). As described in the Government's briefing:

"[T]he term 'significantly' . . . is ambiguous, and . . . EPA may permissibly determine the amount of a State's 'significant' contribution by reference to the amount of emissions reductions achievable through application of highly cost-effective controls." Reply

Brief for Federal Petitioners 15–16 (emphasis added; some internal quotation marks omitted).

And as the Government stated at oral argument:

"[I]n terms of the language, 'contribute significantly,' . . . EPA reasonably construed that term to include a component of difficulty of achievement [*i.e.*, cost]; that is, in common parlance, we might say that dunking a basketball is a more *significant* achievement for somebody who is 5 feet 10 than for somebody who is 6 feet 10." Tr. of Oral Arg. 9 (emphasis added).

But of course the statute does not focus on whether the upwind State has "achieved significantly"; it asks whether the State has "contributed significantly" to downwind pollution. The provision addresses the physical effects of physical causes, and it is only the magnitude of the relationship sufficient to trigger regulation that admits of some vagueness. Stated differently, the statute is ambiguous as to *how much* of a contribution to downwind pollution is "significant," but it is not at all ambiguous as to whether factors unrelated to the *amounts of pollutants* that make up a contribution affect the analysis. Just as "[i]t does not matter whether the word 'yellow' is ambiguous when the agency has interpreted it to mean 'purple,'" *United States* v. *Home Concrete & Supply, LLC*, 566 U. S. ___, ___, n. 1 (2012) (SCALIA, J., concurring in part and concurring in judgment) (slip op., at 2, n. 1), it does not matter whether the phrase "amounts which . . . contribute significantly [to downwind NAAQS nonattainment]" is ambiguous when EPA has interpreted it to mean "amounts which are inexpensive to eliminate."

It would be extraordinary for Congress, by use of the single word "significantly," to transmogrify a statute that assigns responsibility on the basis of amounts of pollutants emitted into a statute authorizing EPA to reduce interstate pollution in the manner that it believes most

efficient. We have repeatedly said that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 468 (2001) (citing *MCI Telecommunications Corp.* v. *American Telephone & Telegraph Co.*, 512 U. S. 218, 231 (1994); *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 159–160 (2000)).

The statute's history demonstrates that "significantly" is not code for "feel free to consider compliance costs." The previous version of the Good Neighbor Provision required each State to prohibit emissions that would "*prevent* attainment or maintenance by any other State of any [NAAQS]." 91 Stat. 693 (emphasis added). It is evident that the current reformulation (targeting "any air pollutant in amounts which will . . . contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any [NAAQS]") was meant simply to eliminate any implication that the polluting State had to be a but-for rather than merely a contributing cause of the downwind nonattainment or maintenance problem—not to allow cost concerns to creep in through the back door.

In another respect also EPA's reliance upon the word "significantly" is plainly mistaken. The Good Neighbor Provision targets for elimination not only those emissions that "contribute significantly to nonattainment [of NAAQS] in . . . any other State," but also those that "interfere with maintenance [of NAAQS] by . . . any other State." §7410(a)(2)(D)(i)(I). The wiggle-word "significantly" is absent from the latter phrase. EPA does not—cannot—provide any textual justification for the conclusion that, when the same amounts of a pollutant travel downwind from States X and Y to a single area in State A, the emissions from X but not Y can be said to "interfere

with maintenance" of the NAAQS in A just because they are cheaper to eliminate. Yet EPA proposes to use the "from each according to its ability" approach for nonattainment areas *and* maintenance areas.

To its credit, the majority does not allude to, much less try to defend, the Government's "significantly" argument. But there is a serious downside to this. The sky-hook of "significantly" was called into service to counter the criterion of upwind-state responsibility plainly provided in the statute's text: *amounts of pollutants* contributed to downwind problem areas. See Brief for Federal Petitioners 42–45. Having forsworn reliance on "significantly" to convert responsibility for amounts of pollutants into responsibility for easy reduction of pollutants, the majority is impaled upon the statutory text.

## B. The Alleged "Gap"

To fill the void created by its abandonment of EPA's "significantly" argument, the majority identifies a supposed gap in the text, which EPA must fill: While the text says that each upwind State must be responsible for its own contribution to downwind pollution, it does not say how responsibility is to be divided among multiple States when the total of their combined contribution to downwind pollution in a particular area exceeds the reduction that the relevant NAAQS requires. In the example given by the majority, *ante*, at 21–22, when each of three upwind States contributes 30 units of a pollutant to a downwind State but the reduction required for that State to comply with the NAAQS is only 30 units, how will responsibility for that 30 units be apportioned? Wow, that's a hard one—almost the equivalent of asking who is buried in Grant's Tomb. If the criterion of responsibility is *amounts of pollutants*, then surely shared responsibility must be based upon *relative amounts of pollutants*—in the majority's example, 10 units for each State. The statute makes

no sense otherwise. The Good Neighbor Provision contains a gap only for those who blind themselves to the obvious in order to pursue a preferred policy.

But not only does the majority bring in cost-benefit analysis to fill a gap that does not really exist. Having filled that "gap," it then extends the efficiency-based principle to situations *beyond the imaginary gap*—that is, situations *where no apportionment is required*. Even where an upwind State contributes pollutants to only a *single* downwind State, its annual emissions "budget" will be based not upon the amounts of pollutants it contributes, but upon what "pollution controls [are] available at the chosen cost thresholds." *Ante*, at 9. EPA's justification was its implausible (and only half-applicable) notion that "significantly" imports cost concerns into the provision. The majority, having abandoned that absurdity, is left to deal with the no-apportionment situation with no defense—not even an imaginary gap—against a crystal-clear statutory text.

### C. The Majority's Criticisms of Proportional Reduction
#### 1. Impossibility

The majority contends that a proportional-reduction approach "could scarcely be satisfied in practice" and "appears to work neither mathematically nor in practical application, *ante*, at 23—in essence, that the approach is impossible of application. If that were true, I know of no legal authority and no democratic principle that would derive from it the consequence that EPA could rewrite the statute, rather than the consequence that the statute would be inoperative. "There are sometimes statutes which no rule or canon of interpretation can make effective or applicable to the situations of fact which they purport to govern. In such cases the statute must simply fail." 3 R. Pound, Jurisprudence 493 (1959) (footnote omitted). In other words, the impossibility argument has

no independent force: It is relevant only if the majority's textual interpretation is permissible. But in any event, the argument is wrong.

The impossibility theorem rests upon the following scenario: "Imagine that States X and Y . . . contribute air pollution to State A in a ratio of one to five . . . ." *Ante*, at 23. And suppose that "States X and Y also contribute pollutants to a second downwind State (State B), this time in a ratio of seven to one." *Ibid.* The majority concludes that "[t]he Court of Appeals' proportionality edict with respect to *both* State A and State B appears to work neither mathematically nor in practical application." *Ibid.* But why not? The majority's model relies on two faulty premises—one an oversimplification and the other a misapprehension.

First, the majority's formulation suggests that EPA measures the comparative downwind drift of pollutants in free-floating proportions between States. In reality, however, EPA assesses quantities (in physical units), not proportions. So, the majority's illustration of a 1-to-5 ratio describing the relative contributions of States X and Y to State A's pollution might mean (for example) that X is responsible for 0.2 unit of some pollutant above the NAAQS in A and that Y is responsible for 1 unit. And the second example, assuming a 7-to-1 ratio underlying State X's and Y's contributions to State B's pollution, might mean that State X supplies 0.7 unit of the same pollutant above the NAAQS and State Y, 0.1 unit. Under a proportional-reduction approach, State X would be required to eliminate emissions of that pollutant by whatever minimum amount reduces both State A's level by 0.2 unit and State B's by 0.7 unit. State Y, in turn, would be required to curtail its emissions by whatever minimum amount decreases both State A's measure by 1 unit and State B's by 0.1 unit.

But, the majority objects, the reductions that State X

must make to help bring State B into compliance may be more than those necessary for it to help bring State A into compliance, resulting in "over-control" of X with respect to A. See *ante*, at 23–25, and n. 19. This objection discloses the second flaw in the impossibility theorem. Echoing EPA, see Brief for Federal Petitioners 47–48, the majority believes that the D. C. Circuit's interpretation of the Good Neighbor Provision forbids over-control with respect to even a single downwind receptor. That is the only way in which the proportional-reduction approach could be deemed "to work neither mathematically nor in practical application" on its face. *Ante*, at 23. But the premise is incorrect. Although some of the D. C. Circuit's simplified examples might support that conclusion, its opinion explicitly acknowledged that the complexity of real-world conditions demands the contrary: "To be sure, . . . there may be some truly unavoidable over-control in some downwind States that occurs as a byproduct of the necessity of reducing upwind States' emissions enough to meet the NAAQS in other downwind States." 696 F. 3d 7, 22 (2012). Moreover, the majority itself recognizes that the Good Neighbor Provision does not categorically prohibit over-control. "As the Good Neighbor Provision seeks attainment in *every* downwind State, . . . exceeding attainment in one State cannot rank as 'over-control' unless unnecessary to achieving attainment in *any* downwind State." *Ante*, at 29–30. The majority apparently fails to appreciate that, having cleared up that potential point of confusion, nothing stands in the way of the proportional-reduction approach.

The majority relies on an EPA document preceding the Transport Rule to establish the Agency's supposed belief that the proportional-reduction approach "could scarcely be satisfied in practice." *Ante*, at 23. But the document says no such thing. Rather, it shows that the Agency rejected a proportion-based, "air[-]quality-only" methodology not because it was impossible of application, but be-

cause it failed to account for costs. See App. in No. 11–
1302 etc. (CADC), pp. 2311–2312. The document labels as
a "technical difficulty" (not an impossibility) the fact that
"most upwind states contribute to multiple downwind
[receptors] (in multiple states) and would have a different
reduction percentage for each one." *Id.*, at 2312. The
Clean Air Act is full of technical difficulties, and this one
is overcome by requiring each State to make the greatest
reduction necessary with respect to any downwind area.

## 2. Over-Control

Apparently conceding that the proportional-reduction
approach may not be impossible of application after all,
the majority alternatively asserts that it would cause
"costly overregulation unnecessary to, indeed in conflict
with, the Good Neighbor Provision's goal of attainment."
*Ante*, at 24. This assertion of massive overregulation
assumes that a vast number of downwind States will be
the accidental beneficiaries of collateral pollution reduc-
tions—that is, nontargeted reductions that occur as a
consequence of required reductions targeted at neighbor-
ing downwind States. (Collateral pollution reduction is
the opposite of collateral damage, so to speak.) The major-
ity contends that the collateral pollution reductions en-
joyed by a downwind State will cause the required upwind
reductions actually targeting that State to exceed the level
necessary to assure attainment or maintenance, thus
producing unnecessary over-control. I have no reason to
believe that the problem of over-control is as extensive and
thus "costly" as the majority alleges, and the majority
provides none.

But never mind that. It suffices to say that over-control
is no more likely to occur when the required reductions are
apportioned among upwind States on the basis of *amounts
of pollutants* contributed than when they are apportioned
on the basis of *cost*. There is no conceivable reason why

the efficient-reduction States that bear the brunt of the
majority's (and EPA's) approach are less likely to be over-
controlled than the major-pollution-causing States that
would bear the brunt of my (and the statute's) approach.
Indeed, EPA never attempted to establish that the
Transport Rule did not produce gross over-control. See
696 F. 3d, at 27. What causes the problem of over-control
is not the *manner of apportioning* the required reductions,
but the *composite volume* of the required reductions in
each downwind State. If the majority's approach reduces
over-control (it admittedly does not entirely eliminate it),
that is only because EPA applies its cost-effectiveness
principle not just to determining the proportions of re-
quired reductions that each upwind State must bear, but
to determining the volume of those required reductions.
See *supra*, at 7.

In any case, the solution to over-control under a propor-
tional-reduction system is not difficult to discern. In
calculating good-neighbor responsibilities, EPA would
simply be required to make allowance for what I have
called collateral pollution reductions. The Agency would
set upwind States' obligations at levels that, after taking
into account those reductions, suffice to produce attain-
ment in all downwind States. Doubtless, there are multi-
ple ways for the Agency to accomplish that task in accord-
ance with the statute's amounts-based, proportional
focus.[2] The majority itself invokes an unexplained device
to prevent over-control "in uncommon particular applica-
tions" of its scheme. *Ante*, at 31. Whatever that device is,
it can serve just as well to prevent over-control under the
approach I have outlined.

————————

[2] The majority insists that "proportionality cannot be one of those
ways." *Ante*, at 25. But it is easy to imagine precluding unnecessary
over-control by reducing in a percent-based manner the burdens of each
upwind State linked to a given downwind area, which would retain the
proportionality produced by my approach.

I fully acknowledge that the proportional-reduction approach will demand some complicated computations where one upwind State is linked to multiple downwind States and vice versa. I am confident, however, that EPA's skilled number-crunchers can adhere to the statute's *quantitative* (rather than efficiency) mandate by crafting *quantitative* solutions. Indeed, those calculations can be performed at the desk, whereas the "from each according to its ability" approach requires the unwieldy field examination of many pollution-producing sources with many sorts of equipment.

### D. Plus Ça Change:
### EPA's Continuing Quest for Cost-Benefit Authority

The majority agrees with EPA's assessment that "[u]sing costs in the Transport Rule calculus . . . makes good sense." *Ante*, at 26. Its opinion declares that "[e]liminating those amounts that can cost-effectively be reduced is an efficient and equitable solution to the allocation problem the Good Neighbor Provision requires the Agency to address." *Ibid.* Efficient, probably. Equitable? Perhaps so, but perhaps not. See Brief for Industry Respondents 35–36. But the point is that whether efficiency should have a dominant or subordinate role is not for EPA or this Court to determine.

This is not the first time EPA has sought to convert the Clean Air Act into a mandate for cost-effective regulation. *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457 (2001), confronted EPA's contention that it could consider costs in setting NAAQS. The provision at issue there, like this one, did not expressly bar cost-based decisionmaking—and unlike this one, it even contained words that were arguably ambiguous in the relevant respect. Specifically, §7409(b)(1) instructed EPA to set primary NAAQS "the attainment and maintenance of which . . . are requisite to protect the public health" with "an adequate margin

of safety." One could hardly overstate the capaciousness of the word "adequate," and the phrase "public health" was at least equally susceptible (indeed, much more susceptible) of permitting cost-benefit analysis as the word "significantly" is here. As the respondents in *American Trucking* argued, setting NAAQS without considering costs may bring about failing industries and fewer jobs, which in turn may produce poorer and less healthy citizens. See *id.*, at 466. But we concluded that "in the context of" the entire provision, that interpretation "ma[de] no sense." *Ibid.* As quoted earlier, we said that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not . . . hide elephants in mouseholes." *Id.*, at 468.

In *American Trucking*, the Court "refused to find implicit in ambiguous sections of the [Clear Air Act] an authorization to consider costs that has elsewhere, and so often, been expressly granted," *id.*, at 467, citing a tradition dating back to *Union Elec. Co.* v. *EPA*, 427 U. S. 246, 257, and n. 5 (1976). There are, indeed, numerous Clean Air Act provisions explicitly permitting costs to be taken into account. See, *e.g.*, §7404(a)(1); §7521(a)(2); §7545(c)(2); §7547(a)(3); §7554(b)(2); §7571(b); §7651c(f)(1)(A). *American Trucking* thus demanded "a textual commitment of authority to the EPA to consider costs," 531 U. S., at 468—a hurdle that the Good Neighbor Provision comes nowhere close to clearing. Today's opinion turns its back upon that case and is incompatible with that opinion.[3]

---

[3] The majority shrugs off *American Trucking* in a footnote, reasoning that because it characterized the provision there in question as "absolute," it has nothing to say about the Good Neighbor Provision, which is not absolute. See *ante*, at 28, n. 21. This is a textbook example of begging the question: Since the Good Neighbor Provision is not absolute (the very point at issue here), *American Trucking*, which dealt with a provision that is absolute, is irrelevant. To the contrary, *American Trucking* is right on point. As described in text, the provision at issue

## II. Imposition of Federal Implementation Plans

The D. C. Circuit vacated the Transport Rule for the additional reason that EPA took the reins in allocating emissions budgets among pollution-producing sources through Federal Implementation Plans (FIPs) without first providing the States a meaningful opportunity to perform that task through State Implementation Plans (SIPs). The majority rejects that ruling on the ground that "the Act does not require EPA to furnish upwind States with information of any kind about their good neighbor obligations before a FIP issues." *Ante*, at 16. "[N]othing in the statute," the majority says, "places EPA under an obligation to provide specific metrics to States before they undertake to fulfill their good neighbor obligations." *Ante*, at 17. This remarkably expansive reasoning makes a hash of the Clean Air Act, transforming it from a program based on cooperative federalism to one of centralized federal control. Nothing in the Good Neighbor Provision suggests such a stark departure from the Act's fundamental structure.

### A. Implications of State Regulatory Primacy

Down to its very core, the Clean Air Act sets forth a federalism-focused regulatory strategy. The Act begins by declaring that "air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is *the primary responsibility of States and local governments*." §7401(a)(3) (emphasis added). State primacy permeates Title I, which addresses the promulgation and implementation of NAAQS, in particular. Under §7409(a), EPA must promulgate NAAQS for each pollutant for which air-quality criteria have been

---

here is even more categorical ("absolute") than the provision at issue in *American Trucking*.

issued pursuant to §7408.  Section 7410(a)(1), in turn, requires each State, usually within three years of each new or revised NAAQS, to submit a SIP providing for its "implementation, maintenance, and enforcement."  EPA may step in to take over that responsibility if, and only if, a State discharges it inadequately.  Specifically, if the Agency finds that a State has failed to make a required or complete submission or disapproves a SIP, it "shall promulgate a [FIP] at any time within 2 years . . . , unless the State corrects the deficiency, and [EPA] approves the [SIP] or [SIP] revision."  §7410(c)(1).

To describe the effect of this statutory scheme in simple terms: After EPA sets numerical air-quality benchmarks, "Congress plainly left with the States . . . the power to determine which sources would be burdened by regulation and to what extent."  *Union Elec. Co.*, 427 U. S., at 269. The States are to present their chosen means of achieving EPA's benchmarks in SIPs, and only if a SIP fails to meet those goals may the Agency commandeer a State's authority by promulgating a FIP.  "[S]o long as the ultimate effect of a State's choice of emission limitations is compliance with the [NAAQS], the State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation."  *Train* v. *Natural Resources Defense Council, Inc.*, 421 U. S. 60, 79 (1975).  EPA, we have emphasized, "is relegated by the Act to a secondary role in the process of determining and enforcing the specific, source-by-source emission limitations which are necessary if the [NAAQS] are to be met."  *Ibid.*

The Good Neighbor Provision is one of the requirements with which SIPs must comply.  §7410(a)(2)(D)(i)(I).  The statutory structure described above plainly demands that EPA afford States a meaningful opportunity to allocate reduction responsibilities among the sources within their borders.  But the majority holds that EPA may in effect force the States to guess at what those responsibilities

might be by requiring them to submit SIPs before learning what the Agency regards as a "significan[t]" contribution—with the consequence of losing their regulatory primacy if they guess wrong. EPA asserts that the D. C. Circuit "was wrong as a factual matter" in reasoning that States cannot feasibly implement the Good Neighbor Provision without knowing what the Agency considers their obligations to be. Brief for Federal Petitioners 29. That is literally unbelievable. The only support that EPA can muster are the assertions that "States routinely undertake technically complex air quality determinations" and that "emissions information from all States is publicly available." *Ibid.* As respondents rightly state: "All the scientific knowledge in the world is useless if the States are left to guess the way in which EPA might ultimately quantify 'significan[ce].'" Brief for State Respondents 50.

Call it "punish[ing] the States for failing to meet a standard that EPA had not yet announced and [they] did not yet know," 696 F. 3d, at 28; asking them "to hit the target . . . *before* EPA defines [it]," *id.*, at 32; requiring them "to take [a] stab in the dark," *id.*, at 35; or "set[ting] the States up to fail," *id.*, at 37. Call it "hid[ing] the ball," Brief for State Respondents 20; or a "shell game," *id.*, at 54. Call it "pin the tail on the donkey." Tr. of Oral Arg. 24. As we have recently explained:

> "It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time . . . and demands deference." *Christopher* v. *SmithKline Beecham Corp.*, 567 U. S. ___, ___ (2012) (slip op., at 14).

That principle applies *a fortiori* to a regulatory regime

that rests on principles of cooperative federalism.

## B. Past EPA Practice

EPA itself has long acknowledged the proposition that it is nonsensical to expect States to comply with the Good Neighbor Provision absent direction about what constitutes a "significan[t]" contribution to interstate pollution.

The Agency consistently adopted that position prior to the Transport Rule. In 1998, when it issued the $NO_X$ SIP Call under §7410(k)(5), EPA acknowledged that "[w]ithout determining an acceptable level of $NO_X$ reductions, the upwind State would not have guidance as to what is an acceptable submission." 63 Fed. Reg. 57370. EPA deemed it "most efficient—indeed necessary—for the Federal government to establish the overall emissions levels for the various States." *Ibid.* Accordingly, the Agency quantified good-neighbor responsibilities and then allowed States a year to submit SIPs to implement them. *Id.*, at 57450–57451.

Similarly, when EPA issued the Clean Air Interstate Rule (CAIR) in 2005 under §7410(c), it explicitly "recognize[d] that States would face great difficulties in developing transport SIPs to meet the requirements of today's action without th[e] data and policies" provided by the Rule, including "judgments from EPA concerning the appropriate criteria for determining whether upwind sources contribute significantly to downwind nonattainment under [§74]10(a)(2)(D)." 70 *id.*, at 25268–25269. The Agency thus gave the States 18 months to submit SIPs implementing their new good-neighbor responsibilities. See *id.*, at 25166–25167, 25176. Although EPA published FIPs before that window closed, it specified that they were meant to serve only as a "Federal backstop" and would not become effective unless necessary "a year after the CAIR SIP submission deadline." 71 *id.*, at 25330–25331 (2006).

Even since promulgating the Transport Rule, EPA has repeatedly reaffirmed that States cannot be expected to read the Agency's mind. In other proceedings, EPA has time and again stated that although "[s]ome of the elements of the [SIP-submission process] are relatively straightforward, . . . others clearly require interpretation by EPA through rulemaking, or recommendations through guidance, in order to give specific meaning for a particular NAAQS." 76 *id.*, at 58751 (2011). As an example of the latter, the Agency has remarked that the Good Neighbor Provision "contains numerous terms that require substantial rulemaking by EPA in order to determine such basic points as what constitutes significant contribution," citing CAIR. *Ibid.*, n. 6. In fact, EPA repeated those precise statements not once, not twice, but *30 times* following promulgation of the Transport Rule.[4]

Notwithstanding what parties may have argued in other litigation many years ago, it is beyond responsible debate that the States cannot possibly design FIP-proof SIPs without knowing the EPA-prescribed targets at which they must aim. EPA insists that it enjoys significant discretion—indeed, that it can consider essentially whatever factors it wishes—to determine what constitutes a "significan[t]" contribution to interstate pollution; and it simultaneously asserts that the States ought to know what quantities it will choose. The Agency—and the

_____

[4] In addition to the citations in text, see 77 Fed. Reg. 50654, and n. 7 (2012); *id.*, at 47577, and n. 7; *id.*, at 46363, and n. 7; *id.*, at 46356, and n. 9; *id.*, at 45323, and n. 7; *id.*, at 43199, and n. 7; *id.*, at 38241, and n. 6; *id.*, at 35912, and n. 7; *id.*, at 34909, and n. 7; *id.*, at 34901, and n. 8; *id.*, at 34310, and n. 7; *id.*, at 34291, and n. 8; *id.*, at 33384, and n. 7; *id.*, at 33375, and n. 7; *id.*, at 23184, and n. 7; *id.*, at 22543, and n. 4; *id.*, at 22536, and n. 7; *id.*, at 22253, and n. 8; *id.*, at 21915, and n. 7; *id.*, at 21706, and n. 6; *id.*, at 16788, and n. 4; *id.*, at 13241, and n. 5; *id.*, at 6715, and n. 7; *id.*, at 6047, and n. 4; *id.*, at 3216, and n. 7; 76 *id.*, at 77955, and n. 7 (2011); *id.,* at 75852, and n. 7; *id.*, at 70943, and n. 6; *id.*, at 62636, and n. 3.

majority—cannot have it both ways.

## C. Abuse of Discretion

The majority attempts to place the blame for hollowing out the core of the Clean Air Act on "the Act's plain text." *Ante*, at 16. The first textual element to which it refers is §7410(c)'s requirement that after EPA has disapproved a SIP, it "shall promulgate a [FIP] at any time within 2 years." That is to say, the Agency has discretion whether to act at once or to defer action until some later point during the 2-year period. But it also has discretion to work within the prescribed timetable to respect the rightful role of States in the statutory scheme by delaying the issuance or enforcement of FIPs pending the resubmission and approval of SIPs—as EPA's conduct surrounding CAIR clearly demonstrates. And all of this assumes that the Agency insists on disapproving SIPs before promulgating the applicable good-neighbor standards—though in fact EPA has discretion to publicize those metrics before the window to submit SIPs closes in the first place.

The majority states that the Agency "retained discretion to alter its course" from the one pursued in the NOx SIP Call and CAIR, *ante*, at 17, but that misses the point. The point is that EPA has discretion to arrange things so as to preserve the Clean Air Act's core principle of state primacy—and that it is an *abuse of discretion* to refuse to do so. See §7607(d)(9)(A); see also 5 U. S. C. §706(2)(A) (identical text in the Administrative Procedure Act). Indeed, the proviso in §7410(c)(1) that the Agency's authority to promulgate a FIP within the 2-year period terminates if "the State corrects the deficiency, and [EPA] approves the [SIP] or [SIP] revision" explicitly contemplates just such an arrangement.[5]

---

[5] I am unimpressed, by the way, with the explanation that the majority accepts for EPA's about-face: that the D. C. Circuit admonished it to "act with dispatch in amending or replacing CAIR." *Ante,* at 18 (citing

The majority's conception of administrative discretion is so sprawling that it would allow EPA to subvert state primacy not only with respect to the interstate-pollution concerns of the Good Neighbor Provision, but with respect to the much broader concerns of the NAAQS program more generally. States must submit SIPs "within 3 years" of each new or revised NAAQS "*or such shorter period as [EPA] may prescribe.*" §7410(a)(1) (emphasis added). Because there is no principled reason to read that scheduling provision in a less malleable manner than the one at issue here, under the majority's view EPA could demand that States submit SIPs within a matter of days—or even hours—after a NAAQS publication or else face the immediate imposition of FIPs.

The second element of "plain text" on which the majority relies is small beer indeed. The Good Neighbor Provision does not expressly state that EPA must publish target quantities before the States are required to submit SIPs—even though the Clean Air Act does so for NAAQS more generally and for vehicle inspection and maintenance programs, see §7511a(c)(3)(B). From that premise, the majority reasons that "[h]ad Congress intended similarly to defer States' discharge of their obligations under the Good Neighbor Provision, Congress . . . would have included a similar direction in that section." *Ante*, at 17. Perhaps so. But EPA itself read the statute differently when it declared in the NO$_X$ SIP Call that "[d]etermining the overall level of air pollutants allowed to be emitted in a State *is comparable to determining [NAAQS]*, which the courts have recognized as EPA's responsibility, and is

_____

*North Carolina* v. *EPA*, 550 F. 3d 1176, 1178 (2008) (*per curiam*)). Courts of Appeals' raised eyebrows and wagging fingers are not law, least so when they urge an agency to take ultra vires action. Nor can the encouragement to act illegally qualify as a "good reaso[n]" for an agency's alteration of course under *FCC* v. *Fox Television Stations, Inc.*, 556 U. S. 502, 515 (2009).

distinguishable from determining the particular mix of controls among individual sources to attain those standards, which the caselaw identifies as a State responsibility." 63 Fed. Reg. 57369 (emphasis added).

The negative implication suggested by a statute's failure to use consistent terminology can be a helpful guide to determining meaning, especially when all the provisions in question were enacted at the same time (which is not the case here). But because that interpretive canon, like others, is just one clue to aid construction, it can be overcome by more powerful indications of meaning elsewhere in the statute. It is, we have said, "no more than a rule of thumb that can tip the scales when a statute could be read in multiple ways." *Sebelius* v. *Auburn Regional Medical Center*, 568 U. S. ___, ___ (2013) (slip op., at 9) (internal quotation marks and brackets omitted). The Clean Air Act simply cannot be read to make EPA the primary regulator in this context. The negative-implication canon is easily overcome by the statute's state-respecting structure—not to mention the sheer impossibility of submitting a sensible SIP without EPA guidance. Negative implication is the tiniest mousehole in which the majority discovers the elephant of federal control.

*          *          *

Addressing the problem of interstate pollution in the manner Congress has prescribed—or in any other manner, for that matter—is a complex and difficult enterprise. But "[r]egardless of how serious the problem an administrative agency seeks to address, . . . it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" *Brown & Williamson*, 529 U. S., at 125 (quoting *ETSI Pipeline Project* v. *Missouri*, 484 U. S. 495, 517 (1988)). The majority's approval of EPA's approach to the Clean Air Act violates this foundational principle of popular government.

I dissent.